NEW JERSEY STATE AFL-CIO, A VOLUNTARY ASSOCIA-
TION, AND VINCENT J. MURPHY, CHARLES H. MARCI-
ANTE AND RICHARD A. LYNCH, INDIVIDUALLY AND
AS OFFICERS OF THE NEW JERSEY STATE AFL-CIO,
PLAINTIFFS-APPELLANTS, v. HORACE J. BRYANT, JR.,
COMMISSIONER OF BANKING AND INSURANCE OF
THE STATE OF NEW JERSEY, AND HOSPITAL SERVICE
PLAN OF NEW JERSEY, A CORPORATION OF NEW
JERSEY, DEFENDANTS-RESPONDENTS.

Argued December 16, 1969—Decided December 30, 1969.

*Mr. Thomas L. Parsonnet* argued the cause for appellants (*Messrs. Parsonnet, Parsonnet & Duggan,* attorneys).

*Mr. S. Joseph Fortunato* argued the cause for respondent Hospital Service Plan of New Jersey (*Mr. James J. Petrella* on the brief; *Messrs. Pitney, Hardin & Kipp,* attorneys).

*Mr. C. Russell Kramer* argued the cause for New Jersey State Chamber of Commerce, *et al., amicus curiae* (*Mr. Lester Handler* on the brief; *Messrs. Smith, Kramer & Morrison,* attorneys).

*Mr. T. Girard Wharton,* Special Counsel appointed by the Attorney General to represent the Public argued the cause for respondents. (*Mr. Sheldon B. Brand,* on the brief).

*Mr. Walter R. Davis, Jr.,* Deputy Attorney General, argued the cause for respondent Commissioner of Banking and Insurance (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

PER CURIAM. In this proceeding plaintiffs attack the authority of the Commissioner of Banking and Insurance to grant temporary emergency increases, averaging 28.5%, in Hospital Service Plan (Blue Cross) rates. The increases which were approved by the Commissioner on August 25, 1969 became effective on December 1, 1969 and will expire on April 30, 1970.

On May 28, 1969, Blue Cross filed with the Commissioner of Banking and Insurance proposed rate increases which

were to become effective on October 1, 1969. The increases averaging approximately 44.3% related to certain hospital service contracts. The action was taken pursuant to *N. J. S. A.* 17:48–6.5 and 17:48–9 which require the filing of a full schedule of rates to be charged by the Plan before any contracts are entered into with subscribers. It is to be noted that the cited sections of the statute do not require express approval of the rates by the Commissioner before they become effective. Both sections say that after the rate schedule is filed the "Commissioner may disapprove [it] at any time if he finds that such rates are excessive, inadequate or unfairly discriminatory." It would thus appear that, unless the Commissioner disapproves, a rate schedule of the type involved here would become operative on filing subject to the giving of the prescribed 90-day notice to certain contract subscribers, *N. J. S. A.* 17:48–6(a).

The statute contains neither mandate nor provision for a hearing on such a rate schedule.[1] The Commissioner's brief informs us, however, that it has been his policy to hold public hearings thereon. Moreover, to assist him in seeking a just result at such hearings the Attorney General with the approval of the Governor appoints a "Public Defender." *N. J. S. A.* 52:17A–13. Pursuant to that salutary policy and after notice to all interested parties, as well as to the public generally, a hearing on the fairness and adequacy of Blue Cross's proposed rate increases was scheduled for and began on July 30, 1969. At that time more than 20 witnesses were heard; substantial expert and informed lay witnesses described the Hospital Service Plan's difficult financial condition and the urgent need for upward revision of its subscriber rates. Testimony of its officers revealed that the Plan's reserve balance which was $12,000,000 on December 31, 1968 had declined to

---

[1] In a similar statutory context in New York it was held that the Commissioner of Social Welfare need not hold hearings. *Mid-Island Hospital v. Wyman*, 25 *A. D.* 2d 765, 269 *N. Y. S.* 2d 259 (App. Div. 1966).

$3,200,000 by March 31, 1969 and stood at minus $3,009,641 on June 30, 1969. One officer predicted a deficit of $17,000,000 by the end of 1969, while another estimated it at $15,000,000. The principal producing cause of the difficulty was said to be the ever-rising per diem hospital care costs which accounted for 80% of the overall requested rate increases. It was said that increased hospital costs alone required a rate increase of 36.3%. No contrary testimony was produced by the objectors.

The hearing was recessed until August 20. In the meantime the Commissioner indicated that the renewed proceeding would concern itself primarily with the need for some emergency relief in the form of temporarily increased rates. It seems obvious from the record that one reason for consideration of interim relief was the fact that the Public Defender's investigation and study of the matter — particularly of the rising hospital costs — could not be completed for some time.

On August 20 evidence was adduced to show that under existing rates as of December 1, 1969, the earliest date on which a rate increase would be possible (*N. J. S. A.* 17:48–6 (a)), Blue Cross would have a projected deficit of $15,000,-000. Further testimony indicated that it was technically insolvent and that it was presently operating in violation of *N. J. S. A.* 17:48–10 which requires a minimum reserve of not less than $100,000. An actuary in the Department of Banking and Insurance was questioned by the Public Defender. Although this witness was somewhat critical of the accounting methods followed by the Plan, he conceded that Blue Cross was in serious financial distress, and that its assets were substantially less (*i. e.* $3,009,641) than its liabilities. His opinion was that as of December 1, the Blue Cross deficit would be between 10 and 15 million dollars. In answer to the Commissioner's inquiry, he said that to stabilize the deficit from December 1, 1969 through March 31, 1970, the estimated earliest possible date at which it was thought the Public Defender could complete his study, a rate increase of about 28% would be required.

At the close of this portion of the hearing, the Public Defender suggested that the Commissioner approve an interim rate increase sufficient to freeze Blue Cross's current deficit pending completion of his investigation and that a hearing be held later after all the facts had been assembled at which time the matter would be ripe for a decision as to the proper permanent rates. The President of the Plan argued for a more substantial increase than would be required to merely freeze the deficit pending final hearing. He contended that the Commissioner was charged by the statute with the continuing obligation of insuring the solvency of the Plan. In commenting on the various arguments the Commissioner indicated his thinking about the pressing nature of the problem. He said:

"* * * [d]uring this period when we are proceeding to make the studies deemed necessary to eliminate a number of questions in the minds of the public, we intend to give such relief as will keep you in business and we expect to have a final determination which will to the extent possible reflect the findings and recommendations and determinations of the Public Defender * * *.

So that we are not closing the hearing. We are continuing the hearing but we are attempting to keep Blue Cross alive so that the new infusion developing as a result of your work will be reflected in the future operations of Blue Cross and with an appropriate rate at that time, adjustment of the interim relief to make that all possible.

Is that understandable to you, Mr. Wharton?

Mr. Wharton: Yes, Sir, that's fine."

On August 25, 1969 the Commissioner announced that he was approving "emergency" rate increases averaging 28.5% effective December 1, 1969. The increases were to be temporary only and would expire on April 30, 1970. Blue Cross thereupon gave the required 90-day notice of the new rate to its subscribers.

Plaintiffs claim that the Commissioner's action is limited to disapproval of a filed rate schedule only if, after a full and final hearing, he finds the rates to be excessive, inadequate or discriminatory. They contend that the statute contains no

authorization for an emergency temporary rate increase. We cannot agree.

The Commissioner is invested with broad general powers of administration over all the laws of the State relative to insurance. *N. J. S. A.* 17:1–1, 2. More specifically in the context of this case, he has express authority to disapprove Blue Cross rates if he finds them to be "excessive or inadequate." *N. J. S. A.* 17:48–6.5; 17:48–9. Moreover if the Commissioner concludes that Blue Cross's "condition or methods of business are such as to render the continuance of its operations hazardous to the public or its members or that the assets of such corporation are less than its liabilities * * *" he may institute a Superior Court action to enjoin the corporation from the transaction of any further business and to obtain appointment of a receiver. *N. J. S. A.* 17:48–13. This section of the statute says also that "[a]ny such corporation may be deemed insolvent whenever it is presently or prospectively unable to fulfill its outstanding contracts and to maintain the reserves required pursuant to this act." In passing upon the scope of these administrative powers, courts will liberally construe the legislative language so as to permit the Commissioner to achieve the task assigned to him, and they will imply "if need be, incidental powers reasonably adapted to that end." *Allendale Field & Stream Ass'n v. Legalized Games,* 41 *N. J.* 209, 217 (1963).

There is no provision in the statute barring an interim rate increase pending completion of a hearing as to the adequacy or inadequacy of either existing or proposed rates. In the absence of an express prohibition, the broad language of the authority conferred on the Commissioner ought to be deemed by implication to carry power for interim relief. Accepting the evidence of Blue Cross's financial distress for present purposes, it is not reasonable to suppose that the Legislature intended that administrative action by the Commissioner in such cases be limited to an insolvency proceeding in the Superior Court. Plainly the interest of the millions of policy holders as well as the public interest generally is

best served by preserving the Plan as a going concern until a final determination can be made as to the causes of its plight and as to the nature of any permanent relief that may be necessary. Under the circumstances we hold that the Legislature has conferred upon the Commissioner the implied power to grant emergency interim rate relief pending final determination, where in his judgment the exigencies of the case require it.

The merits of the interim rate increase so far as its factual basis is concerned are not under attack at this time. The order approving it was made after 400 pages of testimony were taken and many exhibits were presented to the Commissioner in support of Blue Cross's urgent need for such relief. The figures showing its financial plight are accepted by the parties at this juncture in order to present the strictly legal issue of the Commissioner's authority to act as he did prior to the conclusion of the entire hearing. We have dealt with the case in that light and accordingly limit our decision to a holding that the Commissioner has the necessary power to allow an interim increase in subscriber rates. See, *Procaccino v. Stewart*, 25 *N. Y.* 2d 301, 304 *N. Y. S.* 2d 433, 251 *N. E.* 2d 802 (1969). The ultimate decision as to fair and just permanent rates must be based upon an evaluation of the evidence already in the record as well as that which may be submitted by the Public Defender and by any other interested party.

The Commissioner's order is affirmed.

*For affirmance*—Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—5.

*For reversal*—None.