746 A.2d 25 (2000)
328 N.J. Super. 344
In the Matter of the REORGANIZATION OF the MEDICAL INTER-INSURANCE EXCHANGE OF NEW JERSEY.
Superior Court of New Jersey, Appellate Division.
Argued November 10, 1999.
Decided February 14, 2000.
*27 H. Curtis Meanor, Newark, for appellants, Allen B. Gold, Robert A. Goldstone, and Morton J. Seligman (Lampf, Lipkind, Prupis, Petigrow and LaBue, attorneys; Neil L. Prupis, on the brief, West Orange).
Mitchell A. Newmark, Deputy Attorney General, for respondent New Jersey Department of Banking and Insurance (John J. Farmer, Jr., Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Mr. Newmark, on the brief).
Hersh Kozlov, Cherry Hill, for respondent Medical Inter-Insurance Exchange of New Jersey (Kozlov, Seaton, Romanini, Brooks & Greenberg, attorneys; Mr. Kozlov, of counsel; Gregory A. Lomax, Frank A. DiGiacomo and John J. Dugan, on the brief).
David J. D'Aloia, Newark, for intervenor Medical Society of New Jersey (Saiber Schlesinger Satz & Goldstein, attorneys; Mr. D'Aloia, of counsel; Joan M. Schwab and Adam S. Ravin, on the brief).
Before Judges KLEINER, PAUL G. LEVY and CARCHMAN.
*26 The opinion of the court was delivered by CARCHMAN, J.A.D.
In response to the increasing burden imposed on the medical profession by high malpractice insurance premiums, respondent Medical Inter-Insurance Exchange of New Jersey (MIIX) was established in 1977 as a reciprocal insurance exchange to provide medical malpractice liability and related lines of insurance. In 1997, in an effort to "enhance its strategic and financial flexibility" and to provide its members with marketable stock and, in some cases, cash, MIIX's Board of Governors sought to reorganize MIIX from a reciprocal insurer to a stock insurer. Unlike other jurisdictions, New Jersey does not presently provide a statutory mechanism for a direct conversion, so MIIX sought to accomplish its corporate objectives consistent with presently existing statutory authority. MIIX conceived of a plan to a) create a new stock insurance company and a holding company; b) essentially transfer the assets and liabilities of the present company to the new company; c) acquire, for consideration, subsidiary companies; d) allocate and distribute common stock and cash to current and recent former MIIX members; and thereafter, e) dissolve the reciprocal company. All of these proposed steps would be consistent with and designed to conform to existing statutory authority and subject MIIX to the regulatory oversight and approval of the Commissioner of Banking and Insurance.
In March 1998, Elizabeth Randall, the then Commissioner of the New Jersey Department of Banking and Insurance ("Commissioner" or "Department") conditionally approved a Plan of Reorganization (Plan) authorizing MIIX's dissolution and reorganization as a stock insurance company. New Jersey State Medical Underwriters, Inc. (Medical Underwriters), a wholly owned subsidiary of intervenor, the Medical Society of New Jersey (MSNJ), contracted *28 to act as attorney-in-fact and manage MIIX's operations.
Appellants, Allen B. Gold, Robert A. Goldstone, and Morton J. Seligman, three MIIX-insured doctors, challenge the reorganization and conversion arguing that the Plan approval should be set aside for three reasons: (1) the Department erred because the approval was unauthorized by statute, the wrong standards were applied, and no evidence supported the conclusion that the stock allocation was fair and equitable; (2) the Department violated the Administrative Procedure Act (APA) and constitutional due process requirements by providing inadequate notice; and (3) there was insufficient evidence to support the agreed-upon payment to MSNJ for Medical Underwriters. In addition to their legal arguments, appellants assert that equity requires that current, long-term subscribers receive stock distributions in proportion to their total contributions to MIIX's surplus and reserves, not in proportion to the net premiums paid during the last three years. They also express concern that the reorganization will result in higher malpractice premiums in the future.
We reject their contentions and affirm.

I.
The issues in this appeal arise in the following factual and procedural context. MIIX was established in 1977 under the auspices of MSNJ as a reciprocal insurance exchange authorized by N.J.S.A. 17:50-1 to -19. Many initial subscribers, sometimes referred to as founders, including appellants, made interest-free loans (since repaid) during MIIX's startup period. At the time this proceeding commenced, MIIX subscribers numbered approximately 12,000 members.
In October 1997, MIIX's Board of Governors (Board) sought approval from the Commissioner to convert to a stock insurance company. As we have noted, no statute expressly authorized such conversion or required the Commissioner's approval. However, statutory authority exists for the formation of stock ownership insurance companies, N.J.S.A. 17:17-1 to -20, which, when such entity is created, requires certification by the Commissioner. N.J.S.A. 17:17-10.
MIIX filed the Plan with the Department on October 16, 1997. On October 24, 1997, MIIX sent a letter to its members informing them that on October 15, 1997, the Board had approved a plan to reorganize from a reciprocal insurance exchange to a stock company. It advised that the plan provided for MIIX to acquire Medical Underwriters, then owned by MSNJ, and set forth reasons in support of the change. The letter continued:
The next step in advancing the plan will involve approval by the Commissioner of the New Jersey Department of Banking and Insurance in the coming months. We anticipate this will include a public hearing conducted by the Commissioner, and the date will be communicated to you. Following the Commissioner's approval, MIIX members will receive the information they need to vote on the plan sometime in the first half of 1998.
Finally, the letter provided a telephone contact to respond to subscriber's questions.
On December 1, 1997, a summary of the Plan and notice of hearing to be held on December 22, 1997, were published in the New Jersey Register, and a copy of the notice and Plan summary was thereafter forwarded to the members by letter dated December 12, 1997.
According to the summary, the Plan's intent was "to create in MIIX Insurance Company a successor to MIIX that is virtually identical to MIIX except for its form (i.e., stock insurer rather than reciprocal)." The principal purposes of reorganization were to "enhance [MIIX's] strategic and financial flexibility" and to provide distributees with stock of the MIIX Group, Inc. (the new holding company that would own MIIX), or cash. After the new MIIX *29 had assumed the business, assets and liabilities of the current MIIX and the holding company had acquired Medical Underwriters and its subsidiaries, the reciprocal exchange would be dissolved.
Of particular interest to the Commissioner and concern to appellants was the use of a three-year look-back period for stock distribution. Under the terms of the Plan, stock would be allocated to distributees (those who were members during a three-year look-back period before the Plan adoption on October 15, 1997) based on the MIIX direct premium earned, less any return premium, attributable to each member over the look-back period.
Gold and Goldstone objected in separate letters to Assistant Banking and Insurance Commissioner Donald Bryan dated December 18 and 19, 1997. Gold argued that conversion was unnecessary and likely to lead to higher premiums; that it would benefit the Board more than the members; and that the short notice gave the appearance of impropriety. Goldstone also asserted that the notice was inadequate, and argued that the distribution scheme penalized long-term members like him who had paid full premiums for many years but had paid less during the Plan's proposed three-year look-back period because they were semi-retired.
At the hearing held on December 22, 1997, with Bryan presiding as hearing officer, Daniel Goldberg, then president and chief executive officer of Medical Underwriters, described the Plan and explained that the primary reason for the change was management's belief that in the long term, the only capital source available, retained surplus, would be insufficient to allow necessary growth.
As explained by Kenneth Koreyva, vice-president and chief financial officer of Medical Underwriters, the acquisition value of Medical Underwriters, $11 million in stock and $100,000 in cash, was based on a valuation by investment bankers Salomon Brothers, Inc. (Salomon Brothers). Salomon Brothers provided an opinion that the consideration to be received by the distributees was fair to them as a group from a financial point of view. Salomon Brothers also opined that the consideration to be paid to acquire Medical Underwriters was fair to MIIX from a financial point of view. MIIX rules and regulations provided that the Plan was subject to the approval of at least two-thirds of the votes of the members voting in person or by proxy at a special meeting. (The Plan was subsequently approved by the membership on March 17, 1999.)
Koreyva suggested that the three-year look-back period to determine distributees was fair and reasonable and represented a compromise between distribution only to current members, which was potentially unfair, and distribution to all current and former members who might have contributed to surplus over the life of the enterprise, which was a practical impossibility. Various of the members had died or retired since MIIX was established and determination of their various interests would be problematic. The three-year look-back period also conformed to the majority rule applied in other jurisdictions to analogous conversions.
Neither Gold, nor Goldstone nor any other members of the public presented comments at the hearing. The record was held open for written comments through the end of December. After the record was closed, appellants' counsel wrote a series of letters to the Department in opposition to the Plan. The correspondence was not considered.
Bryan, as hearing officer, found that the Plan accorded with MIIX's rules of governance and satisfactorily addressed the Department's regulatory concerns for the protection of policyholders and the market. He noted that in the absence of a codified statutory procedure for the Department's review, the Department had chosen to follow the rulemaking process set forth in N.J.S.A. 52:14B-4. The Department's analysis included information from its records *30 such as the formation filing, present rating systems and previously filed periodic financial reports.
The hearing officer found that MIIX's stated reasons for the conversion (primarily, better access to capital markets for growth) were important for the long-term viability of the enterprise. He concluded that the Plan adequately protected policyholders and claimants because the new MIIX would assume MIIX's liabilities and receive assets sufficient to support them and that the members would be treated fairly when the exchange was dissolved. MIIX Group stock would be distributed to them based on a three-year look-back, and the surviving entity would be entirely owned and controlled by present and recent former members, except for the portion of stock issued to MSNJ in exchange for the assets of Medical Underwriters. He found that the valuation of Medical Underwriters and the calculation of stock distribution to members were both reasonable and adequately supported by the opinion of Salomon Brothers.
Bryan then reviewed the cessation of business under the orderly withdrawal statute, N.J.S.A. 17:17-10, and found that the Plan satisfactorily prevented or minimized any market disruptions. He found that the creation of a domestic stock insurer was likely to accord with N.J.S.A. 17:17-1 to -20 and N.J.A.C. 11:1-28.1 to -28.12. The reorganization would not prejudice MIIX's policyholders, claimants or the insurance-buying public, but, to the contrary, would generally benefit them. Significantly, he found "that the proposed plan of distribution is clearly reasonable and equitable." He noted that the officers and members of the Board would not receive any of the stock of the MIIX Group except to the extent that they qualified as policyholders the same as other members, and that no one person or entity would obtain ten percent or more of the voting stock.
The hearing officer noted appellants' concern with notice, but found the notice of the pending application consistent with the rulemaking provisions of the APA, and that, in addition, MIIX had given its members notice individually. Timely written comments had been received from two interested parties, and were given the same weight as public testimony would have been given. He recognized appellants' complaint that long tenure as members would not be reflected in the stock distribution plan, but accepted Koreyva's testimony about the practical difficulty of allocating stock based on participation dating back to MIIX's formation. He found concerns about the distribution plan better resolved among the MIIX membership, when MIIX approval was considered.
On March 5, 1998, the Commissioner conditionally approved the Plan adopting Bryan's report. Thereafter, appellants moved for a rehearing which was denied. Appellants filed a notice of appeal, and we, thereafter, granted MSNJ's motion to intervene.
Appellants argue that the Commissioner erred in conditionally approving the Plan because no statute authorized such approval, she failed to apply appropriate standards in evaluating the Plan, and there was no evidence to support a finding that the stock allocation would be fair and equitable. Respondents and intervenor respond that the approval was authorized by two statutes providing for formation of a new company and dissolution of the old entity, and that it was not arbitrary, capricious or unreasonable.

II.
We first address the standard of review which governs our analysis of administrative action. An appellate court "will not reverse an agency decision unless it is `arbitrary, capricious or unreasonable or is not supported by substantial credible evidence in the record as a whole.'" Department of Ins. v. Universal Brokerage Corp., 303 N.J.Super. 405, 409, 697 A.2d 142 (App.Div.1997) (quoting Dennery v. *31 Board of Educ., 131 N.J. 626, 641, 622 A.2d 858 (1993)). The burden of proof rests upon the challenger; the agency decision carries a strong presumption of reasonableness, and the court must not substitute its judgment for that of the agency. Id. at 409-10, 697 A.2d 142. Moreover, the expertise of the Commissioner "in the field of insurance must be given great weight." In re Assignment of Exposures to the Aetna Cas. and Surety Co., 248 N.J.Super. 367, 376, 591 A.2d 631 (App.Div.), certif. denied, 126 N.J. 385, 599 A.2d 162 (1991), cert. denied, 502 U.S. 1121, 112 S.Ct. 1244, 117 L.Ed.2d 476 (1992). Applying these principles, we now examine appellants' claims.
Appellants assert that in the absence of statutory authorization, it was "presumptuous" for MIIX to "concoct a process" for conversion. They cite the standards of the mutual life insurer conversion statute, N.J.S.A. 17:17C-1 to -14 (L. 1998, c. 46, effective July 1, 1998) (1998 demutualization statute), enacted after the Commissioner's decision here and admittedly inapplicable, contending that MIIX was precluded from converting without comparable statutory authority and guidelines or unanimous consent of the subscribers.
Appellants later argue that, absent an enabling statute, the Plan could be neither adopted by MIIX, nor approved by the Department except with the consent of all the members, and that the deference normally accorded an agency decision is inappropriate in the absence of sufficient statutory standards and procedures citing German Mut. Fire Ins. Co. v. Schwarzwaelder, 59 N.J. Eq. 589, 591, 44 A. 769 (E. & A. 1899), which they contend is dispositive. Schwarzwaelder held that a mutual insurance company lacked the right to transform itself into a joint stock company against the will of a member who became a member before passage of a March 6, 1899, act authorizing such a transformation. Id. at 594, 44 A. 769. The court observed that, "The power to change a mutual insurance company into a joint stock company is one which, if possessed at all, must be derived from the statute." Id. at 591, 44 A. 769.
Schwarzwaelder does not establish that a reciprocal insurer cannot convert to a stock company without express statutory authority or unanimous consent of its subscribers. Even if it is assumed that the stated proposition remains valid, Schwarzwaelder is not controlling. First, it applied to a mutual, not a reciprocal, insurer. A reciprocal association differs from a mutual company in that it has no corporate existence. 43 Am.Jur.2d Insurance § 77 (1982). Second, the conversion here was made under statutory authority, though in two steps.
We first observe that MIIX was created pursuant to statutory authority, N.J.S.A. 17:50-1 to -19, which incorporated a provision that exchanges created under the statute "shall be regulated by this act, and by no other statute of this State relating to insurance, except as herein otherwise provided." N.J.S.A. 17:50-1. We note that the statute is silent as to a mechanism for voluntary dissolution. As the Attorney General noted at oral argument, the Legislature could not have intended that such reciprocals continue on in perpetuity.
Absent such statutory authority to voluntarily dissolve, we deem it appropriate to focus on the general powers of the Commissioner. "The Commissioner is invested with broad general powers of administration over all the laws of the State relative to insurance." New Jersey State AFL-CIO v. Bryant, 55 N.J. 171, 176, 260 A.2d 225 (1969) (citing N.J.S.A. 17:1-1, 2). The Department of Banking and Insurance Act of 1996, N.J.S.A. 17:1-13 to -24, confers on the Commissioner broad duties and responsibilities. For example, the Commissioner is directed to "[d]etermine all matters of policy within the commissioner's jurisdiction;" to "[i]nstitute or cause to be instituted the legal proceedings or processes *32 necessary to enforce properly and give effect to any of the commissioner's powers or duties;" and to "[p]erform such other functions as may be prescribed by law in this act or by any other law." N.J.S.A. 17:1-15(f), (g), (j).
In exercising her general regulatory authority over MIIX's proposed conversion, the Commissioner utilized the withdrawal statute, N.J.S.A. 17:17-10(b), as an appropriate standard to measure MIIX's actions against protection of the public interest. The withdrawal statute[1] was enacted as part of the Fair Automobile Insurance Act of 1990, L. 1990, c. 8, and was obviously not designed for the purpose of facilitating a reorganization or conversion. It focused on allowing the Commissioner to exercise oversight and regulate the impact of a carrier's withdrawal from the insurance market. While we recognize that the statute was not designed for the purpose utilized by the Commissioner here, we find the utilization of the standards incorporated in the statute by analogy to be an appropriate exercise of the Commissioner's general regulatory power. The Commissioner's affirmative finding that policy holders (and to a lesser extent, employees and creditors) will be protected under the conversion satisfies any regulatory concern for that class of persons to be protected by the Commissioner's statutory oversight. As to the second step in the statutory process, appellants do not dispute that the Commissioner was vested with the authority to approve the formation of an insurance company upon the stock plan and issue a certificate authorizing it to transact business. N.J.S.A. 17:17-10(a).
We conclude that under the Commissioner's general regulatory powers and by application of the standards set forth in the withdrawal statute, the Commissioner had appropriate statutory authority on which to sanction the conversion.

III.
Appellants next argue that the hearing officer wrongly failed to determine the fairness of allocation of stock among the class of distributees based on actuarial opinion, but instead determined only that it was reasonable. Although he did not rely on actuarial opinion, he did find the distribution plan was both reasonable and fair. We observe that it is by no means obvious that the plan apparently proposed by appellants (determining the class of distributees by a three-year look-back but allocating stock based on total past contributions) would be more equitable than the one adopted. It would benefit them to the detriment of other current members.
The hearing officer found the distribution plan was "within the bounds of reasonableness and practicality." He noted, "In approving the plan, the Department will not substitute its judgement [sic] for the determination of the membership as to *33 the best plan for distribution as expressed through its governance mechanism." He also acknowledged analogous demutualization statutes adopted in other states, and said, "These authorities applied to analogous circumstances support the conclusion that the proposed plan of distribution is clearly reasonable and equitable."
While Salomon Brothers disclaimed any opinion on the fairness of the allocation among distributees, it did give its opinion that the consideration to the distributees as a group was fair. MIIX presented proofs at the hearing that the distribution plan was "a compromise between the potentially unfair approach of distribution only to current members and the practically impossible approach of distribution to all current and former members who might have contributed to the surplus of the Company over the life of the enterprise." According to Koreyva, the three-year look-back approach was "fair and reasonable."
Appellants argue that the twenty-five states that have reciprocal insurer conversion statutes require more than just a generalized finding that the proposed allocation and distribution must be "fair and reasonable." Appellants suggest that reciprocal conversions in those jurisdictions must be equitable to subscribers and must give them interests in the new company proportionate to their interests in the reciprocal. Appellants argue that the allocation plan was presumptively inequitable and disproportionate because long term members were the principal source of surplus and reserves. A review of those statutes provides little support for appellants' position.
Our review of the reciprocal conversion statutes from other jurisdictions demonstrates that while they similarly set forth general fairness standards consistent with those found in demutualization statutes, they do not lend further support to appellants' argument that the distribution here was patently unfair. Most prescribe a one-year look-back to define the class of distributees. None prescribes a look-back period for allocation.
Twenty states (Alabama, Alaska, Arizona, Arkansas, Delaware, Florida, Georgia, Hawaii, Idaho, Kentucky, Maine, Maryland, Montana, Nevada, New Mexico, Oklahoma, Vermont, Washington, West Virginia and Wyoming) have reciprocal insurer statutes containing relevant provisions that are very similar to each other in both format and language. See Ala.Code §§ 27-31-15, -27, -28 (1999); Alaska Stat. §§ 21.75.140, .250, .260 (Michie 1999); Ariz.Rev.Stat. Ann. §§ 20-778, -789, -790 (West 1999); Ark.Code Ann. §§ 23-70-112, -122, -123 (Michie 1999); Del.Code Ann. tit. 18, §§ 5724, 5725 (1999); Fla. Stat. Ann. §§ 629.161, .281, .291 (West 1999); Ga.Code Ann. §§ 33-17-17, -28, -30 (1999); Haw.Rev.Stat. Ann. §§ 431:4-422, -424, -504 (Michie 1999); Idaho Code §§ 41-2916, -2928, -2929 (1999); Ky.Rev.Stat. Ann. §§ 304.27-260, -270 (Banks-Baldwin 1999); Me.Rev.Stat. Ann. tit. 24-A, §§ 3874, 3875 (West 1999); Md.Code Ann., Ins. §§ 3-201, -221 (1999); Mont.Code Ann. §§ 33-5-202, -402, -411 (1999); Nev.Rev.Stat. Ann. §§ 694B.240, .250 (Michie 1999); N.M. Stat. Ann. §§ 59A-39-24, -25 (Michie 1999); Okla. Stat. Ann. tit. 36, §§ 2917, 2928, 2929 (West 1999); Vt. Stat. Ann. tit. 8, §§ 4854, 4855 (1999); Wash. Rev.Code Ann. §§ 48.10.190, .320, .330 (West 1999); W. Va.Code §§ 33-21-25, -26 (1999); Wyo. Stat. Ann. §§ 26-27-115, -127, -128 (Michie 1999).
The Alabama law is typical of this group. It provides for merger or conversion:
(a) A domestic reciprocal insurer, upon affirmative vote of not less than two thirds of its subscribers who vote on such merger, pursuant to due notice and the approval of the commissioner of the terms therefor, may merge with another reciprocal insurer or be converted to a stock or mutual insurer.
(b) Such a stock or mutual insurer shall be subject to the same capital or surplus requirements and shall have the same *34 rights as a like domestic insurer transacting like kinds of insurance.
(c) The commissioner shall not approve any plan for such merger or conversion which is inequitable to subscribers or which, if for conversion to a stock insurer, does not give each subscriber preferential right to acquire stock of the proposed insurer proportionate to his interest in the reciprocal insurer, as determined in accordance with Section 27-31-27 and a reasonable length of time within which to exercise such right.
[Ala.Code § 27-31-28 (1999) (emphasis added).]
The distribution plan is described in Section 27-31-27:
Upon the liquidation of a domestic reciprocal insurer, its assets remaining after discharge of its indebtedness and policy obligations, the return of any contributions of the attorney or other persons to its surplus made as provided in Section 27-31-15, and the return of any unused premium, savings or credits then standing on subscribers' accounts, shall be distributed to its subscribers who were such within the 12 months prior to the last termination of its certificate of authority, according to such reasonable formula as the commissioner may approve.

[Ala.Code § 27-31-27 (emphasis added).]
Return of contributions is controlled by Section 27-31-15:
The attorney or other parties may advance to a domestic reciprocal insurer, upon reasonable terms, such funds as it may require, from time to time, in its operations. Sums so advanced shall not be treated as a liability of the insurer and, except upon liquidation of the insurer, shall not be withdrawn or repaid except out of the insurer's realized earned surplus in excess of its minimum required surplus. No such withdrawal or repayment shall be made without the advance approval of the commissioner.

[Ala.Code § 27-31-15.]
All twenty of these statutes similarly provide that the insurance commissioner may approve no plan for conversion that is "inequitable to subscribers," or does not give each subscriber the preferential right to acquire stock "proportionate to his interest in the reciprocal insurer." A majority of these states require this interest to be determined by distributing assets according to a "reasonable formula." Two states require only that the distribution is done "according to such formula as may have been approved by the Commissioner." Haw.Rev.Stat. Ann. §§ 431:4-424, -504; Wash. Rev.Code Ann. §§ 48.10.320, .330. No statute suggests that allocation should have been made proportionate to total past contributions to surplus and equity, rather than net earned premiums for the past three years. Of particular probity is that the standard for the distribution is a "reasonable" standard, the same adopted by the Commissioner here.
Nineteen of the twenty statutes provide a twelve-month look-back to define the class of distributees.[2] Appellants do not challenge the Commissioner's use of a three-year look-back period for that purpose, though they object to use of the same period for the purpose of allocation.
Appellants also direct the court to reciprocal conversion statutes in five other statesCalifornia, Massachusetts, New York, South Dakota and Virginia. See Cal. Ins.Code §§ 1560-1560.19 (West 1999);[3]Mass. Gen. Laws Ann. ch. 175, § 94N (West 1999); N.Y. Ins. Law §§ 7308-7309 (McKinney 1999); S.D Codified Laws § 58-34-61 (Michie 1999); Va. *35 Code Ann. § 38.2-1230 (Michie 1999). They do not compel a different conclusion.
California specifically provides detailed procedures for the conversion of certain reciprocal insurers (organized after 1974 to provide medical malpractice insurance) to incorporated stock insurers. Cal. Ins.Code §§ 1560-1560.19. The commissioner is charged with judging whether the conversion plan is "fair, just, and equitable to the insurer and its policyholders." Id. § 1560.05(a)(1).
Massachusetts provides for conversion of a reciprocal insurance exchange to a domestic mutual insurance company upon a two-thirds vote of subscribers of a plan approved by the commissioner as "conforming to the requirements of this section and as fair, reasonable and not prejudicial to the subscribers of such exchange or to the insuring public." Mass. Gen. Laws Ann. ch. 175, § 94N(1)-(2). Eligible subscribers are those who were members on the conversion date and who owned a policy in full force (with additional conditions) "on both the December thirty-first immediately preceding the conversion date and the date the exchange's advisory committee first votes to convert to mutual form." Id. § 94N(5). Each eligible subscriber shall receive appropriate consideration in exchange for membership interests: "Said consideration shall be determinable under a fair and reasonable formula approved by the commissioner, and shall be based upon the exchange's entire surplus as shown by the exchange's financial statement...." Id. § 94N(3).
New York provides for conversion of domestic reciprocal insurers into stock property/casualty companies or mutual property/casualty companies. N.Y. Ins. Law §§ 7308-7309. For conversion into a stock company it requires that "the superintendent shall pass upon the fairness of the terms and conditions of the proposed conversion and of the issuance of shares of the corporation and he shall approve or disapprove the same." Id. § 7308(a). Shares representing the capital and surplus of the corporation "shall be issued to existing subscribers ... in proportion to their shares in the aggregate operating reserves at the time when the proposal to convert is adopted." Id. § 7308(b).
South Dakota expressly prohibits conversion from a domestic reciprocal insurer to a stock or mutual insurer. S.D. Codified Laws § 58-34-61.
The Virginia statute cited by appellants does not expressly provide for conversion from a reciprocal, but requires prior written approval of the insurance commission for all "material transaction[s]" between a domestic reciprocal and its attorney or affiliate that involve more than five percent of the domestic reciprocal's assets. Va.Code Ann. § 38.2-1230(A). The terms must be "fair and equitable" and the Commissioner must consider "whether the transaction adversely affect[s] the interests of the subscribers or the solvency of the reciprocal." Id. § 38.2-1230(A)(1), (B).
Thus, even the minority statutes, like the majority, provide support for a general fairness requirement. Massachusetts and New York refer to surplus as a measure of the consideration to be exchanged for membership interests, but neither requires distribution in direct proportion to contribution to surplus, the principle advocated by appellants.
In sum, the cited statutes fail to demonstrate by analogy that the Commissioner used improper procedures or applied the wrong standards here.
Appellants also analogize to the 1998 demutualization statute, admittedly inapplicable, which requires a fairness determination. That statute requires that the plan of reorganization "be fair and equitable to the policyholders of the mutual insurer." N.J.S.A. 17:17C-3(b)(2). Allocation of consideration among eligible policyholders "shall reflect ... factors such as estimated proportionate contributions of classes or groupings of policies and contracts to the aggregate component of consideration being distributed to eligible *36 policyholders or other factors the commissioner may approve." N.J.S.A. 17:17C-3(c)(2). However relevant this statute may be it is not determinative. The hearing officer did find, albeit without the benefit of an actuarial opinion, that the allocation and distribution was fair. Consideration of net premiums paid during the three-year look-back period was determined to be a reasonable standard to measure contribution even under the demutualization statute. We cannot say that such conclusion is arbitrary or capricious. Any measure or look-back period by its very nature will benefit one class to the detriment of another. The failure to recognize contributions since inception, standing alone, the only factor truly asserted by appellants, cannot demarcate the line of reasonableness or fairness.
Appellants argue that MIIX offered no factual data or expert opinion to support the fairness or equity of the stock allocation formula, and contend that allocation should have been made proportionate to total past contributions to surplus and equity, not premiums paid during the look-back period. As we have noted, Koreyva opined that the three-year look-back was a fair and reasonable way to define the class of distributees. He acknowledged that the Salomon Brothers opinion applied to the consideration paid to distributees as a group.
Koreyva implied that both the definition of the class and the allocation were fair. He rejected as impractical the possibility of distributing stock to all current and former members who had contributed to surplus. Ironically, the allocation plan now suggested by appellants, though more favorable to them as current long-term members, would, like the one adopted, exclude all former members including "founders" beyond the three-year look-back regardless of how much they had contributed in the past. In any event, it was not necessary for Koreyva to explain why other possible allocations were rejected. We conclude that the stock allocation chosen is reasonable and meets the deferential standard of review applicable here.

IV.
Appellants argue that the notice they received of the departmental hearing failed to comply with all the notice requirements set forth for rulemaking in N.J.S.A. 52:14B-4 and deprived them of their constitutional right to due process of law. Respondents and intervenor respond that the Department provided the required notice via its Insurance Division mailing list and the December 1, 1997, New Jersey Register; that MIIX had previously provided notice of its application to its members individually by letters dated October 24 and December 12, 1997; and that appellants were not prejudiced, but submitted timely objections, which the Department considered before taking action.
Appellants do not complain of inadequate notice of MIIX's plan to reorganize. They received a letter dated October 24, 1997, that informed them of the Board approval on October 15 and advised them of a public hearing "in the coming months." Appellants complain, however, that the notice of the hearing date was tardy. A notice of public hearing and Plan summary was published in the December 1, 1997, New Jersey Register. 29 N.J.R. 5110(a) (Dec. 1, 1997). A copy of that notice and Plan summary was enclosed with a letter sent to members between December 12 and 15, 1997.
The Commissioner explains that no hearing was mandated in connection with her regulatory review of MIIX's orderly withdrawal of the reciprocal insurance exchange and formation of the stock insurance company. Nevertheless, she held a formal hearing, providing notice generally in accordance with the procedure required prior to the adoption, amendment or repeal of a rule. N.J.S.A. 52:14B-4(a)(1). Appellants contend that some of the APA notice procedures were omitted. However, they do not dispute the Commissioner's *37 assertion that the APA procedures were not mandated.
Appellants also contend that the notice was so inadequate that it constituted a procedural due process violation. If the APA does not apply, there is still a requirement of administrative due process. George Harms Constr. Co. v. New Jersey Turnpike Auth., 137 N.J. 8, 19, 644 A.2d 76 (1994). It is satisfied if the parties have adequate notice, a chance to know opposing evidence, and the opportunity to respond. Id. at 19-20, 644 A.2d 76. An agency may amend the procedures and abbreviate the comment periods as it deems reasonable. In re Dep't of Insurance's Order, 129 N.J. 365, 382, 609 A.2d 1236 (1992). Only a party with particularized property interests is entitled to an adversarial hearing based on constitutional due process. In re Applications of North Jersey Dist. Water Supply Comm'n, 175 N.J.Super. 167, 203, 417 A.2d 1095 (App.Div.), certif. denied, 85 N.J. 460, 427 A.2d 559 (1980). Appellants have not demonstrated a legitimate property interest in a larger share of the stock distribution.
Nor have appellants demonstrated prejudice from late notice of the hearing. Appellant Gold did not receive the Plan summary, or notice of the December 22 hearing, until six days before the hearing. While we agree with appellants that the December letter provided a very short response time, they do not show that it prejudiced them. Both Gold and Goldstone did submit timely objections, including objections to the short notice, which were considered. The record remained open until December 31, 1997, for the receipt of written comments. Appellants contend that it was impossible for them to collect the information they needed in order to respond meaningfully before December 31, 1997. But they do not show that, given more time, they would have presented information that was likely to have changed the outcome.
On March 16, 1998, appellants and others who opposed the Plan moved before the Department for a rehearing. The certification by counsel that accompanied that motion did not set forth the issues the objectors wished to raise on rehearing. However, among the attachments to the certification was a February 4, 1998, letter to Bryan from the objectors' counsel. In that letter, counsel argued that the conversion would benefit MIIX officers at the expense of MIIX members, and that the allocation of stock was unfair to long-term members. Those issues had already been raised by Gold and Goldstone in their timely letters of objection, which were considered by the Department.
Moreover, although appellants did get short notice of the hearing date, they were alerted individually two months before the hearing that the Board had approved the conversion and that the Department would hold a hearing "in the coming months." They took no action until they received notice of the hearing date. We are satisfied that appellants' claims regarding the defect in notice is without merit.

V.
Lastly, appellants argue that the hearing officer erred by finding sufficient support for MIIX's acquisition of Medical Underwriters for $11 million in stock and $100,000 in cash. Respondents and intervenor respond that the hearing officer properly relied on the valuation by Salomon Brothers, and that appellants improperly raise this argument for the first time on appeal and rely on evidence outside the record.
We agree that the issue is raised too late as appellants' actuarial certification was filed during the pendency of this appeal. We granted MIIX's motion to strike the certification from appellants' appendix.
In any event, Salomon Brothers opined that the consideration to be paid for Medical Underwriters was fair. In preparing its fairness opinion, Salomon Brothers reviewed *38 and analyzed, among other things, MIIX's annual statements from 1992 through 1996. The Department was entitled to rely on that opinion.
In sum, appellants' underlying claim is that their status as founders of this reciprocal is not being appropriately or adequately recognized in the allocation and distribution formula. While we understand their claim, we also recognize that MIIX was established to provide a cost-reduction benefit to appellants and the many other founders and members over the years. They did contribute initial financing, since repaid, but also received the benefit of the premium contributions of those that followed them in providing for the viability of the enterprise.
We conclude that the Commissioner properly approved MIIX's conversion from a reciprocal insurer to a stock insurer and that appellants have failed to demonstrate that such action was arbitrary, capricious or unreasonable.
Affirmed.
NOTES
[1] N.J.S.A. 17:17-10(b) provides:

No company licensed to transact insurance business in this State pursuant to chapter 17 of Title 17 of the Revised Statutes may surrender its certificate of authority or discontinue writing or renewing any kind or kinds of insurance specified in the certificate, except in accordance with a plan to be submitted by the company and approved by the commissioner, which plan shall provide for an orderly withdrawal from the market and for the minimization of the impact of the surrender of the certificate or the discontinuance of the writing or renewing of any kind or kinds of insurance upon the public generally and upon the company's policyholders in this State. No surrender or discontinuance shall become effective until the approved plan has been complied with. In reviewing a plan for withdrawal submitted by the company, the commissioner shall consider, and may require as a condition of approval, whether some or all other certificates of authority issued pursuant to chapter 17 or 32 of Title 17 of the Revised Statutes held by the company or by other companies within the same holding company system as the company submitting the plan shall be required to be surrendered. The provisions of this subsection shall apply to any request for withdrawal, surrender or discontinuance filed on or after January 25, 1990.
[2] The Maryland statute contains neither a look-back provision nor a requirement that the distribution be done according to a "reasonable formula." Md.Code Ann., Ins. §§ 3-201, -221.
[3] Appellants also list Cal. Ins.Code §§ 1550-1559, but those sections pertain to merger, not conversion.