788 A.2d 787 (2002)
346 N.J. Super. 479
In re TAX CREDIT APPLICATION OF PENNROSE PROPERTIES, INC.
Superior Court of New Jersey, Appellate Division.
Submitted October 23, 2001.
Decided January 15, 2002.
*788 Hill Wallack, attorneys for appellant Eastampton Center, L.L.C., (Thomas F. Carroll, III, Princeton, on the brief).
Wolf, Block, Schorr and Solis-Cohen, attorneys for respondent Pennrose Properties, Inc., (Gregory A. Lomax, Cherry Hill, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, attorney for respondent, New Jersey Housing and Mortgage Finance Agency filed a statement in lieu of brief, (Michael J. Spina, Deputy Attorney General, on the statement).
Before Judges WEFING, LESEMANN and PARRILLO.
The opinion of the court was delivered by LESEMANN, J.A.D.
Eastampton Center, L.L.C. (ECLLC), a developer in the Township of Eastampton ("Eastampton" or "the Township"), appeals from a decision of the New Jersey Housing and Mortgage Finance Agency (HMFA) which awarded Pennrose Properties, Inc. (Pennrose), another developer in Eastampton, over $1,000,000 in low income housing tax credits to facilitate construction of a 100 unit rental townhouse complex for low income families. Construction of the project by Pennrose would satisfy Eastampton's Mount Laurel[1] obligation respecting construction of affordable housing.
ECLLC is, in a sense, a competitor of Pennrose. It is pursuing its own development within Eastampton, a 577 unit "inclusionary development" which involves some low income housing that would also satisfy the Township's Mount Laurel obligation. ECLLC does not claim that it should have received the tax credits awarded to Pennrose. Indeed, ECLLC did not apply for those tax credits, but rather maintains that it is, in essence, simply protecting the public interest by protesting a decision which it claims violates the HMFA's own regulations.[2] Those regulations prohibit a developer's receiving a tax credit benefit if it has also received a "density bonus subsidy." *789 ECLLC maintains that Pennrose did receive such a density bonus subsidy and is thus ineligible for the second subsidy benefittax credits. Pennrose maintains that it received no such density bonus subsidy and also argues that ECLLC has no standing to maintain this appeal. While we find that the standing issue is certainly debatable, we prefer, given the public interest in a matter such as this, to resolve the issue on its substantive merits. On that basis, we are satisfied that ECLLC has not met the heavy burden placed on one seeking to overturn the decision of an administrative agency such as HMFA and, accordingly, we affirm.
Although the detailed interplay of the land use transactions, conveyances, court determinations and Mount Laurel requirements in this case are complex, the significant facts of the matter, stripped to their essentials, are relatively uncomplicated. In 1985, Toll Brothers, Inc., which owned a 310 acre tract of land in Eastampton, was engaged in Mount Laurel litigation with the Township. That litigation was resolved by a consent order entered on June 18, 1985, which granted Toll Brothers the right to construct 900 housing units on those 310 acres, with 180 of the units to be "affordable housing," designed to meet the Township's Mount Laurel obligation.
In 1986, Toll Brothers conveyed its 310 acres to an entity known as Land Bank Associates (Land Bank). At the same time, Land Bank acquired two contiguous lots known as Lots 2 and 4 in Block 300 on the Township's tax map. Those two lots comprised approximately seventy acres and had not been included in the original 310 acres owned by Toll Brothers at the time of the 1985 judgment, nor had they been covered by or mentioned in that judgment.
In May 1988, pursuant to an application by Land Bank, the Law Division judge who was supervising the Eastampton Mount Laurel litigation, entered a new consent order which added the seventy acres represented by Lots 2 and 4 in Block 300, to the 310 acres covered by the 1985 order. That order also reduced the Township's Mount Laurel "fair share obligation," reduced the aforesaid 900 units of proposed construction to 350 units, and extended the period of protection and repose to which the Township was entitled under the 1985 settlement of the Mount Laurel litigation.[3]
In 1994, Land Bank filed a bankruptcy petition and on January 13, 1998, its property was acquired, through the United States Bankruptcy Court, by Rancocas Investments, L.L.C. (Rancocas). On January 27, 1999, Eastampton, Rancocas and Pennrose entered into a Developer's Agreement respecting the property originally owned by Toll Brothers (310 acres) plus the additional seventy acres (Lots 2 and 4 in Block 300) which Land Bank acquired elsewhere at the time it bought from Toll Brothers.[4] The Agreement provided that the overall tract owned by Rancocas would be re-subdivided to carve off a *790 25.85 acre portion, consisting of parts of Lots 2 and 12, upon which Pennrose would construct 100 units of affordable housing. The parties acknowledged that Pennrose intended to apply for low income housing tax credits to facilitate that construction. The Agreement specifically noted that "Block 300, Lot 2 was not previously a part of the affordable housing zoning relief entered by the Court as part of the Toll litigation" (the 1985 consent order) [and], "As such, the parties acknowledge that Block 300, Lot 2 was not provided with a `bonus density' as a result of Toll's builder's remedy suit and is entitled to receive 9% tax credits from HMFA." To accomplish the foregoing, the Agreement provided that Rancocas would convey the 25.85 acre parcel to the Township and the Township would then reconvey the parcel to Pennrose.[5]
The Developer's Agreement also provided that Pennrose would not construct any housing units on the remainder of its propertyconstituting approximately 342 acresalthough it could use that remaining property for "non-residential, wetlands mitigation, conservation, recreational, or other uses" set out on a list of permitted uses, most of which involved some form of commercial enterprise.[6]
The low income housing tax credit (the tax credit) is a federal program which provides a credit against federal income taxes. It is available to owners of rental properties who agree to lease the property to low income tenants. Although it is a federal program, it is administered by the states, with each state being provided a defined annual dollar amount of tax credits which it may allocate for housing projects within its borders. In New Jersey, pursuant to N.J.A.C. 5:80-33.1, the HMFA is the agency which administers the program.
As noted, the amount of tax credit which a state has available is limited. The program is popular and desirable for developers of low income housing and there is competition for the limited number of awards available. For the year 1999, the HMFA was able to grant only approximately one out of every four applications received. For the year 2000, New Jersey was allocated $10,143,763 in tax credits. The HMFA received 29 applications requesting *791 total credits of $15,536,137, and was able to grant fifteen of the twenty-nine requests. The agency described the year 2000 as "sort of a low" year, but said it anticipated that 2001 would be more competitive, and that in 2001, it would probably be able to grant only one out of every four or five applications received.
Presumably, at least in part because of the limited resources available, regulations adopted by the HMFA provide that tax credits are not available to a developer who has already received another form of incentive for subsidized housinga density bonus subsidy. N.J.A.C. 5:80-33.2 defines density bonus subsidy as "an economic benefit for low and moderate-income housing resulting from a zoning change that increases permitted density." And N.J.A.C. 5:80-33.13(a) embodies the prohibition against double subsidies, reading as follows:
If a municipality has created a density bonus subsidy to assist the low or moderate income units in a project, the project may not compete for tax credits (ceiling tax credits). This subsection shall not be evaded by failing to apply all or any portion of the subsidy to the low or moderate-income units, by diverting all or any portion of the subsidy to other uses or by using any other device by which all or any portion of the subsidy is not used to benefit low or moderate-income housing.
In 1999, Pennrose applied for tax credits respecting the proposed construction of 100 units of low income housing on its twenty-five acre tract. It was deemed eligible for such tax credits, but in the category in which it competed,[7] it tied for the highest ranking but then lost when a "tie breaker" formula favored another applicant. In 2000, it reapplied, and this time it was successful. ECLLC contests that grant of tax credits, asserting that Pennrose had already received a density bonus, and thus it was ineligible for tax credits. As noted above, we pass the question of ECLLC's standing to even raise the issue, and on its substantive merits, we reject the attack.
First, we note the familiar principles governing an attack on a decision made by an administrative agency. There is a strong presumption that an agency decision is valid. One challenging that decision has a heavy burden of proving the contrary and demonstrating that the decision was arbitrary, unreasonable or capricious. See, In the Matter of the Reorganization of the Med. Inter-Insurance Exchange of New Jersey, 328 N.J.Super. 344, 354, 746 A.2d 25 (App. Div.), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000), hereinafter "MIIX"; Department of Ins. v. Universal Brokerage Corp., 303 N.J.Super. 405, 409-10, 697 A.2d 142 (App.Div.1997). In reviewing such an action, this court has a limited role. Matter of Musick, 143 N.J. 206, 216, 670 A.2d 11 (1996); George Harms Const. Co. v. Turnpike Authority, 137 N.J. 8, 27, 644 A.2d 76 (1994); Gloucester Cty. Welfare Bd. v. New Jersey Civil Serv. Comm'n, 93 N.J. 384, 390, 461 A.2d 575 (1983); Department of Ins. v. Universal Brokerage Corp., supra, 303 N.J.Super. at 409, 697 A.2d 142. Where the record discloses a reasonable basis for the findings and conclusions of the agency, a reviewing court will normally uphold the agency's action. Boyle v. Riti, 175 N.J.Super. 158, 166, 417 A.2d 1091 (App.Div.1980). It is also clear that in reviewing such a determination, the court must give "due regard... to the agency's expertise where such *792 expertise is a pertinent factor." In re Certificate of Need Granted to the Harborage, 300 N.J.Super. 363, 378, 693 A.2d 133 (App.Div.1997) (quoting Mayflower Sec. Co. v. Bureau of Securities, 64 N.J. 85, 92-93, 312 A.2d 497 (1973)). See also MIIX, supra, 328 N.J.Super. at 354, 746 A.2d 25.
ECLLC's attack includes a charge that the HMFA did not have before it an adequate record to justify a conclusion that Pennrose was eligible for tax credits and that it had not already received a density bonus subsidy. Although ECLLC casts that argument in terms of an issue of fact, in reality there is no factual dispute. The facts are clear. Pennrose maintains that those facts demonstrate that it has not received a density bonus subsidy. ECLLC maintains that the facts add up to a contrary conclusion. The agency agreed with Pennrose, and not only do we find that determination well founded and reasonable, but we find it far more compelling than ECLLC's contrary submission.
Pennrose's presentation rests essentially on the undisputed fact that its program will entail construction of 100 housing units on a total of 380 acres of land. Far from representing a "density bonus," Pennrose points out that the actual density is far below that normally permitted by the zoning ordinance. In fact, the average density (the total acreage divided by the number of housing units) indicates a density of one unit for each 3.8 acres. Pennrose maintains that analysis is accurate, appropriate, and realistic, because, although all 100 of its units will be constructed on one twenty-five acre parcel, there will be no housing construction on any part of the remainder of the tract. That limitation is expressed clearly, and without equivocation, in the Developer's Agreement and is undisputed. In addition, Pennrose notes that Lot 2 in Block 300, which forms part of the twenty-five acre tract on which the 100 units will be constructed, was not owned by Toll Brothers or Land Bank at the time of the earlier Mount Laurel litigation and the 1985 judgment described above.
In support of its tax credit application, Pennrose submitted to the HMFA two letters from the Special Master appointed by the Superior Court judge supervising the Eastampton Mount Laurel litigation, setting out the Master's conclusion that Pennrose had not previously received a density bonus and thus was eligible for tax credit financing. In his first letter, dated March 15, 1999, the Special Master (John J. Lynch) traced the history which is sketched above, pointed out that if Pennrose is able to develop its 100 units of low income housing with tax credits on its 25.85 acre site, "it will forego any further residential development on the site, which even under the reduced yield of the 1988 ruling by Judge Gibson would have permitted a total of about 366 units. The overall site yield is even lower when compared with the original Toll Brothers builder's remedy of 900 units on a somewhat smaller overall tract (297 acres)." Mr. Lynch then concluded as follows:
As you will no doubt become aware, the density of the tax credit site itself is about four units per acre, and on the face of it one might conclude that a density bonus is involved because of the underlying gross density of one unit per acre reflected in the 1988 ruling of the Court. I do not view this as a density bonus because it is my understanding that the Township is looking at the total residential yield for the entirety of the holdings of the current owner, Rancocas Investments, which took title to all of the approximately 366 acres in January 1998. It is my understanding that no additional residential development will take place on the balance of the Rancocas *793 holdings providing assurance to NJHMFA that tax credit financing will not be used to assist either an inclusionary housing development with a conventional mix of market and affordable units, nor would it be used in a situation where a density bonus is involved.
In his second letter five days later, Mr. Lynch addressed that provision of N.J.A.C. 5:80-33.13(a), which prohibits any attempt to evade the prohibition against double subsidies by duplicitous action. Mr. Lynch repeated that he had reviewed the proposal, and he then concluded as follows:
[P]lease be advised that the project has not received the density bonus subsidy as defined at N.J.A.C. 5:80-33.2. Furthermore, this rule has not been evaded by failing to apply all or any portion of the bonus density to the low or moderate income units by diverting all or any portion of the bonus density to other uses or by utilizing any other device in which all or any portion of the bonus density is not used to subsidize the low or moderate income housing.[8]
Pennrose's presentation, endorsed by the Special Master and the HMFA, seems more than reasonableindeed much more reasonable than the contrary presentation by ECLLC. In considering the density of a construction project and the impact on a municipality of the construction of low income housing with varying degrees of density, legal title to one tract or another is not determinative. The significant questions are the effects on the municipality and the effects on the area in which the construction is to take place. Here, treating the Pennrose project as encompassing 100 units to be built on more than 300 acres of land is not only reasonable, but is realistic and consistent with rational concepts of overall planning. And, even more to the point in evaluating a challenge to the agency determination here, it is certainly a rational determination which could reasonably be made by the municipality and the HMFA. We see no basis for our intervention, or any insistence that the agency view the twenty-five acre tract owned by Pennrose as unrelated to the remaining 300 acres adjacent to it.
As part of its argument on this point, ECLLC claims there is no indication that the HMFA had all of the facts before it when it approved Pennrose's application for tax credits. However, as noted, the issues in this case, and the issues before the agency, were not factual questions at all. Rather, the question was whether the agency should accept ECLLC's claim which we find strained and unrealistic that Pennrose's project must be viewed as embodying construction on twenty-five acres, with no relation to the remaining acreage on which Pennrose agreed not to construct housing. All of the "facts" were laid out in zoning ordinances, court judgments and orders, and the Developer's Agreement between Pennrose, Rancocas and the Township. All were matters of public record. All are presented on this appeal, and there is no reason to believe that the agency or its staff were so derelict in their obligations as to be unaware of those undisputed facts.
*794 The record of the agency's Tax Credit Committee meeting of June 13, 2000, which approved Pennrose's application, has been submitted. The meeting was a public meeting, which opened with announcement of the agency's compliance with the Open Public Meetings Act, N.J.S.A. 10:4-6, and a reading of the published notice of the meeting. The meeting then continued with a description of the application process, which made clear that the agency's staff had reviewed and analyzed the applications submitted and had then submitted its recommendations to the agency. The staff and the agency members then proceeded through a description of each application, beginning with the "Urban" category, moving next to "Suburban," and then to the remaining three categories. With respect to each, the staff summarized the request, its own recommendation, a brief statement of the reason for any recommended rejection, and, with respect to recommended approvals, the score obtained by the applicant in the competitive process. Not surprisingly, the Urban projects, which were generally larger and costlier, were more complex and elicited more detailed explanations. With respect to the Pennrose project, the staff recommended approval and described the project as having "a score of 80." The agency members then voted on the recommendation, and all voted in favor. We find no impropriety and no basis to conclude that the Agency acted in ignorance or that its members were derelict in their duties.
ECLLC's final argument turns on what we conceive to be an unrealistic construction of the bar against tax credit relief for a developer who has already received a density bonus subsidy. ECLLC maintains that the disqualification applies not only to one who has received a density bonus subsidy for additional residential construction, but also bars tax credits for any developer who has received any form of zoning (or apparently any other) accommodation from a municipality. With respect to the Pennrose development, ECLLC argues that "housing aside," Rancocas and Pennrose were given "very substantial zoning relief, as well as related relief." It notes that Rancocas may pursue "wetlands mitigation" or commercial development on the remainder of its property, even though it is prohibited from any additional residential construction.
The primary difficulty with that argument lies in ECLLC's introductory phrase"housing aside." When considering the applicable regulation, it is not realistic to put "housing aside," because the entire purpose of the regulation is to deal with housing, the construction of housing, and the density of housing. When N.J.A.C. 5:80-33.2 defines density bonus subsidy by referring to "a zoning change that increases permitted density," it is clear that the reference to "permitted density" is to the permitted density of housing units. There is no language in the definition, or in any other provision of the regulations, which suggests that the bar of N.J.A.C. 5:80-33.13(a) against awarding tax credits to one who has already received a density bonus subsidy should be read as barring tax credits to anyone who has received any zoning or other accommodation from a municipality. Pennrose is correct when it argues that under such a construction, "every agreement between a town and a builder which, like here, provides for the passage of non-density zoning changes to simply facilitate the builder's planned construction would disqualify the builder from taking advantage of the NJHMFA's tax credit program." Certainly the language of the regulation does not compel or even support such an extreme construction. If that were its intent, one would expect the prohibitory language to refer not only to "a zoning change that *795 increases permitted density," but to one which permits new or different uses not theretofore permitted. But the regulation contains no such language. Nor do we see any reason why we should strain that language in order to reach a conclusion which would bar a municipality from any realistic assistance to a developer who proposes to construct Mount Laurel housing within that municipality. The philosophy of Mount Laurel favors such assistance; it does not oppose it. The regulation here bars tax credit assistance to a developer who has already received a density bonus subsidy, and that is all it bars. We see no basis for a judicially constructed additional bar. Such a construction would not only run counter to the language of the regulation, but would also offend the well-established principle which calls on this court to defer to the expertise of an administrative agency regarding the interpretation and application of its own regulation. See, Koch v. Dir., Div. of Taxation, 157 N.J. 1, 722 A.2d 918 (1999); Outland v. Bd. of Trustees of Teachers' Pension & Annuity Fund, 326 N.J.Super. 395, 741 A.2d 612 (App.Div.1999).
The decision of the HMFA is affirmed.
NOTES
[1] See Southern Burlington Cty. N.A.A.C.P. v. Mt. Laurel Township, 92 N.J. 158, 456 A.2d 390 (1983).
[2] An "inclusionary development" such as ECLLC's would not normally qualify for low income housing tax credit.

ECLLC's development project is involved in land use and Mount Laurel litigation involving the Township and its land use agencies, which need not be detailed here.
[3] This May 1988 order is referred to in the Developer's Agreement and also in a letter from the court's Special Master to the HMFA. However, apparently no one has been able to locate and produce a copy of the order and in its brief, Pennrose seems to vacillate between describing the order and then suggesting that it may not have existed at all. For purposes of this appeal, we have assumed that there is such an order and that its provisions are essentially as described in the Developer's Agreement and in the parties' briefs.
[4] Adding the original 310 acres plus the seventy acres subsequently acquired indicates a total of 380 acres owned by Rancocas. The Developer's Agreement refers to 367.334 acres owned by Rancocas. The discrepancythe apparently missing thirteen acresis not explained but does not seem significant.
[5] The only discernable reason for that double conveyance, rather than a direct deed from Rancocas to Pennrose, would seem to be a provision in the Agreement which says, "The parties acknowledge that the conveyance or assignment of real estate by a municipality to a tax credit financing applicant will enable the Applicant to receive a high priority for tax credit funding by the HMFA as a `municipal contribution.'" See also, to the same effect, N.J.A.C. 5:80-33.16(a)6.
[6] The Developer's Agreement also contained a provision entitled "ALTERNATIVE INCLUSIONARY AFFORDABLE HOUSING DEVELOPMENT PROPOSAL," which noted that approximately seventy-five to eighty acres of "uplands," forming part of the Rancocas property was "suitable, developable and approvable" for affordable housing, and provided that, in the event the 100 units on the twenty-five acre parcel was not approved and constructed, then Rancocas could proceed to-ward construction of "[a]pproximately 350 market-rate and inclusionary multi-family housing units" on those seventy-five to eighty acres. However, the Agreement made clear that such an alternative was available only if the original intent of the Agreement100 affordable units on the 25.85 acre parcel could not be carried out.

The Agreement also contained a number of ancillary provisions, which we need not enumerate here, relating to the Township's Mount Laurel obligations, stating that the "Township endorses and is fully supportive of Pennrose's intended use of the Property and its willingness to construct tax subsidized income restricted family rental housing" thereon, and expressing the commitment of the Township to cooperate with Pennrose in effecting the central purpose of the Agreement.
[7] The HMFA divides applicants into five categories: Urban; Suburban; Special Needs; Hope VI; and Non-profits. Pennrose's application fell into the Suburban category.
[8] HMFA instructions for submission of a tax credit application respecting any project involved in Mount Laurel litigation requires that the application be accompanied by a certification from the Superior Court judge presiding over that litigation, or a Special Master appointed by the court, certifying that the project has not received a density bonus subsidy. The form provided with the application calls for a simple check off and a conclusory statement by the judge or master, and is far less detailed than the letters submitted here by Mr. Lynch.