848 A.2d 1

IN RE ADOPTION OF THE 2003 LOW INCOME HOUSING
TAX CREDIT QUALIFIED ALLOCATION PLAN.

Superior Court of New Jersey
Appellate Division

Argued March 15, 2004—Decided April 28, 2004.

4 

6

Before Judges HAVEY, NEWMAN and FALL.

*Peter J. O'Connor* argued the cause for appellants Fair Share Housing Center, Camden County Branch of N.A.A.C.P., Southern Burlington County N.A.A.C.P., and Camden City Taxpayers Association (*Fair Share Housing Center,* attorneys; *Mr. O'Connor* and *Kevin D. Walsh,* on the brief).

*Carol Johnston,* Senior Deputy Attorney General, argued the cause for respondent New Jersey Housing and Mortgage Finance Agency (*Peter C. Harvey,* Attorney General, attorney; *Patrick DeAlmeida,* Deputy Attorney General, of counsel; *Ms. Johnston* and *Kimberly A. Sked,* Deputy Attorney General, on the brief).

*Kenneth Zimmerman* argued the cause for amici curiae New Jersey Institute for Social Justice, Coalition for Affordable Housing and the Environment, Housing and Community Development Network, and New Jersey Public Policy Research Institute (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Lawrence S. Lustberg, Philip G. Gallagher* and *Mr. Zimmerman,* of counsel and on the brief).

*William H. Buckman,* attorney for amicus curiae Lawyers' Committee for Civil Rights Under Law (*Mr. Buckman,* of counsel and on the brief).

*Norris, McLaughlin & Marcus,* attorneys for amicus curiae Local Initiatives Support Corporation (*Edward G. Sponzilli,* of counsel; *Haekyoung Suh,* on the brief).

*Carl D. Poplar,* attorneys for amici curiae Professor Myron Orfield of the Institute on Race and Poverty at the University of Minnesota Law School and Professor John A. Powell of the Kirwan Institute for the Study of Race and Ethnicity of Ohio State University (*Mr. Powell, Mr. Orfield* and *Marguerite L. Spencer,* on the brief).

The opinion of the court was delivered by

HAVEY, P.J.A.D.

In this appeal, four public interest organizations challenge the validity of the 2003 Qualified Allocation Plan (QAP) adopted by respondent New Jersey Housing Mortgage Finance Agency (HMFA). A QAP is the means by which a state housing credit agency administers the Low Income Housing Tax Credit (LIHTC) program created by federal law. 26 *U.S.C.A.* § 42. Appellants claim that, because the 2003 QAP funds affordable housing in

urban areas with a high percentage of minority residents, it encourages racial segregation in violation of the Federal Fair Housing Act, 42 *U.S.C.A.* §§ 3601 to 3609 (Title VIII of the Civil Rights Act of 1968), attendant Title VIII and Internal Revenue Service (I.R.S.) regulations, and declared federal housing policy. Appellants also contend that the 2003 QAP violates the *Mount Laurel*[1] doctrine, New Jersey's Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, and sections of the New Jersey Constitution which prohibit segregation of public schools, and require that the Legislature provide a thorough and efficient education. Finally, appellants contend that the HMFA violated the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –14, in the manner by which it adopted the 2003 QAP.

We affirm. HMFA has a duty to administer its housing and financing programs in a manner affirmatively to further the policies of Title VIII. However, the agency's "affirmatively to further" duty must be defined congruent with its express statutory powers and far-reaching housing agenda as defined under federal and state law. *See* 26 *U.S.C.A.* § 42(m)(1)(B) and (C), and the New Jersey Housing and Mortgage Finance Agency Law of 1983, *N.J.S.A.* 55:14K–1 to –81. Considering those powers and goals, we hold that HMFA has satisfied its "affirmatively to further" duty in adopting the 2003 QAP. We also conclude that the 2003 QAP does not violate the New Jersey Constitution, the *Mount Laurel* doctrine or the LAD. Finally, we reject appellants' contention that HMFA violated the APA in the manner by which it adopted the 2003 QAP.

Although this is an appeal from the 2003 QAP, the relevant procedural history dates back to 2002, when appellants filed notices of appeal challenging the 2002 QAP and HMFA's award of tax credits to specific projects located primarily in urban areas.

---

[1] *Southern Burlington Cty. N.A.A.C.P. v. Township of Mount Laurel,* 92 *N.J.* 158, 456 A.2d 390 (1983) (*Mount Laurel II* ); *Southern Burlington Cty. N.A.A.C.P. v. Township of Mount Laurel,* 67 *N.J.* 151, 336 A.2d 713, *appeal dismissed and cert. denied,* 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975) (*Mount Laurel I* ).

While those appeals were pending, HMFA proposed regulations for the 2003 QAP. 35 *N.J.R.* 913(a) (Feb. 18, 2003). The 2003 QAP was reproposed on April 21, 2003, following receipt of comments. 35 *N.J.R.* 1616(a).

On June 25, 2003, HMFA denied appellants' request for a trial-type hearing before the Office of Administrative Law (OAL). On June 19, 2003, HMFA adopted the 2003 QAP, including lengthy responses to appellants' comments and submissions. 35 *N.J.R.* 3298 to 3342. The regulations became effective July 21, 2003. 35 *N.J.R.* 3298.

Appellant Fair Share Housing Center thereupon filed a notice of appeal on September 4, 2003, challenging the 2003 QAP. By separate opinions, and with the consent of the parties, we dismissed the prior appeals from the 2002 QAP. However, the parties agreed that the prior appeals had raised questions "that are both important to the public and likely to recur." In our opinions dismissing the appeals, we held that "[t]he issues of statutory interpretation and of important public interest" may be decided in the challenge to the 2003 QAP. Thereafter, by separate orders, we granted Fair Share Housing Center's motion to add as additional appellants the Camden County N.A.A.C.P., the Burlington County N.A.A.C.P., and the Camden County Taxpayers Association.

I

First enacted in 1986 (*Pub.L. No.* 99–514, 100 *Stat.* 2189), 26 *U.S.C.A.* § 42 provides an incentive for the construction and rehabilitation of low income rental housing by lowering its overall cost through the use of tax credits to developers and owners of qualified rental projects. David Phillip Cohen, *Improving the Supply of Affordable Housing: The Role of the Low–Income Housing Tax Credit,* 6 *J.L. & Pol'y* 537, 541 (1998).[2] The

---

[2] The tax credit provides a credit against federal income taxes to owners of rental properties who agree to rent to low-income tenants. *In re Tax Credit*

program has since become the largest federal subsidy for the development and rehabilitation of affordable housing. Megan J. Ballard, *Profiting From Poverty: The Competition Between For-Profit And Nonprofit Developers For Low-Income Housing Tax Credits,* 55 *Hastings L.J.* 211, 212 (2003). To qualify, a project may set aside 20% or more of the building's residential units to renters whose income is 50% or less than the area's median growth income (the 20–50 test), or set aside at least 40% or more of its units to tenants whose incomes are no greater than 60% of the area's median gross income (the 40–60 test). *Id.* at 229–230; 26 *U.S.C.A.* § 42(g)(1). To be eligible for the credit, the building must be affordable to low-income tenants for an extended period of time, generally fifteen years. 26 *U.S.C.A.* § 42(h)(6)(D).

These tax credits are allocated to the various states according to their population. 26 *U.S.C.A.* § 42(h)(3)(C). "The program is popular and desirable for developers of low income housing and there is competition for the limited number of awards available." *In re Tax Credit of Pennrose Props., supra,* 346 *N.J.Super.* at 485, 788 *A.2d* 787. *See also Ballard, supra,* 55 *Hastings L.J.* at 213 (noting the "stiff competition" for tax credits). The tax credit program is administered by a state's housing credit agency, 26 *U.S.C.A.* § 42(m), which in New Jersey is the HMFA. The housing credit agency must adopt a "qualified allocation plan." 26 *U.S.C.A.* § 42(m)(1)(A). QAPs must include certain preferences and selection criteria. Notably, the projected racial composition of the project and surrounding neighborhood are not among those criteria. Specifically, a QAP means "any plan":

(i) which sets forth selection criteria to be used to determine housing priorities of the housing credit agency which are appropriate to local conditions,

(ii) which also gives preference in allocating housing credit dollar amounts among selected projects to—

(I) projects serving the lowest income tenants,

(II) projects obligated to serve qualified tenants for the longest periods, and

---

*Application of Pennrose Props., Inc.,* 346 *N.J.Super.* 479, 485, 788 *A.2d* 787 (App.Div.2002).

(III) projects which are located in qualified census tracts (as defined in subsection (d)(5)(C)) and the development of which contributes to a concerted community revitalization plan, and

(iii) which provides a procedure that the agency (or an agent or other private contractor of such agency) will follow in monitoring for noncompliance with the provisions of this section and in notifying the Internal Revenue Service of such noncompliance which such agency becomes aware of and in monitoring for noncompliance with habitability standards through regular site visits.

(C) **Certain selection criteria must be used.** The selection criteria set forth in a qualified allocation plan must include—

(i) project location,

(ii) housing needs characteristics,

(iii) project characteristics, including whether the project includes the use of existing housing as part of a community revitalization plan,

(iv) sponsor characteristics,

(v) tenant populations with special housing needs,

(vi) public housing waiting lists,

(vii) tenant populations of individuals with children, and

(viii) projects intended for eventual tenant ownership.

[26 *U.S.C.A.* § 42(m)(1)(B) and (C).]

Each year HMFA adopts a QAP in the form of regulations establishing funding cycles, and decides the amount of credits to be made available in each cycle. *N.J.A.C.* 5:80–33.3. Significant to this appeal, there are a number of differences between the 2002 QAP and the 2003 QAP. In 2002, these cycles were as follows: (1) the "Urban Cycle," *N.J.A.C.* 5:80–33.4 (2002); the "Suburban/Rural Cycle," *N.J.A.C.* 5:80–33.5 (2002); the "HOPE VI Cycle," which consists of projects located in municipalities on the Urban Cycle list which utilize "HOPE VI" funds, *N.J.A.C.* 5:80–33.6 (2002);[3] the "Special Needs Cycle," which refers to projects which address the housing needs of the homeless, people with developmental disabilities, or victims of domestic violence, *N.J.A.C.* 5:80–33.7 (2002); the "Final Cycle," which applies to all projects, with

---

[3] HOPE VI has been described as a federal program to fund the demolition of high-rise public housing and its replacement with less-dense, more economically integrated housing, thereby revitalizing deteriorated inner-city neighborhoods. Ngai Pindell, *Is There Hope for HOPE VI?: Community Economic Development and Localism,* 85 *Conn. L.Rev.* 385 (2003).

at least $1,000,000 allocated to a "HOPE VI" Project, *N.J.A.C.* 5:70–33.8 (2002), and a "Reserve Cycle" which applied to a project that might need additional credits because of technical errors and severe hardship, *N.J.A.C.* 5:80–33.9 (2002). *See* 34 *N.J.R.* 1583 to 1585.

HMFA had approximately $15 million in tax credits to distribute in 2002, and it broke them down by cycle as follows: Urban Cycle, $6,000,000; Suburban/Rural Cycle, $3,150,000; HOPE VI Cycle, $2,105,000; Special Needs Cycle, $1,300,000; Reserve, $149,403; Final Cycle, $2,105,000. 34 *N.J.R.* 2417.

According to HMFA, the 2003 QAP attempts to provide incentives to deconcentrate poverty and to encourage affordable housing in suburban areas. 35 *N.J.R.* 3326. HMFA's 2003 QAP no longer places urban and suburban affordable housing projects in separate funding categories. Instead, HMFA allocated $5 million in tax credits to the "Family Cycle," which included an "[a]ffordability set-aside," such as a mixed-income project, a HOPE VI set-aside, and a nonprofit set-aside, which targets qualified nonprofit organizations that are community-based within a qualified census tract. *N.J.A.C.* 5:80–33.4. 35 *N.J.R.* 3326. $2,400,000 in tax credits are allocated to projects for senior citizens, *N.J.A.C.* 5:80–33.5, $1.2 million to the "Special Needs Cycle," *N.J.A.C.* 5:80–33.6, $1.8 million for the "Final Cycle" which was open to all projects, *N.J.A.C.* 5:80–33.7, and finally an undetermined amount for the "Reserve Cycle," which was to be used to "fund supplemental awards or for unforeseen circumstances" such as where the project's financial feasibility was in jeopardy, *N.J.A.C.* 5:80–33.8.

Although the 2003 QAP carries over many tax-credit regulations made part of prior QAPs, it adds new credits and preferences which are significant. As noted, the 2003 QAP sets aside tax credits for mixed-income housing developments, *N.J.A.C.* 5:80–33.4(a)1, whereas in prior years, such credits were given to projects that were affordable to 100% of its tenants. 35 *N.J.R.* 3303. The 2003 QAP also includes a set-aside of tax credits for HOPE VI projects, *N.J.A.C.* 5:80–33.4(a)2, and for projects spon-

sored by a community-based nonprofit organization that is located within a "qualified census tract[.]" *N.J.A.C.* 5:80–33.4(a)3. Another change is the awarding of "points" for affordable-housing projects made part of a court-ordered or Council On Affordable Housing (COAH) *Mount Laurel* compliance plan. *N.J.A.C.* 5:80–33.15(a)7.

In objecting to the proposed 2003 QAP, appellants relied in part on their comments to the 2002 QAP. Appellants had alleged that the implementation of the 2002 QAP would result in approximately 75% of the tax credits going to projects which would be built in "racially segregated neighborhoods." According to appellants, HMFA was under a constitutional, statutory and regulatory duty to promote racial and economic integration. They argued that the 2002 QAP violated federal housing law and regulations, the *Mount Laurel* doctrine, State constitutional provisions relevant to school segregation, and New Jersey statutes prohibiting racial discrimination.

In challenging the 2003 QAP, appellants also included comments, opinions, speeches and supporting data prepared by David Rusk, who described himself as "an independent consultant on urban policy." Rusk criticized regional contribution agreements (RCAs), *see N.J.S.A.* 52:27D–312, as resulting in affordable housing units not being built in suburban communities and more housing being built or rehabilitated in racially-segregated urban communities. According to Rusk, "the RCAs literally cemented 15,000 to 20,000 poor children into poverty-impacted neighborhoods and school [sic] where they are doomed to fail in overwhelming numbers!" Rusk believed that tax credits for projects in urban areas had the same effect as RCAs. Rusk understood "the motivation of many private, non-profit housing providers for whom LIHTC and RCA funds are vital for the inner-city neighborhood revitalization programs." However, these groups were striking a "devil's bargain" because "such actions perpetuate racial and economic segregation, above all, of children in public schools

with very negative impact on their education and preparation for their adult lives."

HMFA prepared a voluminous response to appellants' comments (35 *N.J.R.* 3298(b) to 3354), which included a statement of the agency's eighteen goals within three broad subheadings: (1) promoting affordable housing; (2) encouraging "[s]mart [g]rowth"; and (3) community revitalization. 35 *N.J.R.* 3321–3329.

HMFA acknowledged that "[o]ne of the largest impediments to revitalization is concentrated poverty." 35 *N.J.R.* 3326. It explained, however, that the 2003 QAP replaced the "urban" and "suburban" cycles with the "family" and "senior" cycles because it was "seeing a growing chasm forming between suburbs and cities and wanted to send a clear signal this year that affordable housing is to be viewed regionally." *Ibid.* Another way it sought to address the problem was by increasing the weight to be accorded to mixed-income housing developments. HMFA also sought to promote mixed-income communities by setting aside funds for "HOPE VI public housing redevelopment projects which typically involve the demolition of high-rise poverty-concentrated family housing structures and their replacement with less concentrated rental and homeownership units marketed to families and individuals of varying incomes." *Ibid.* The 2003 QAP also sought to encourage the use of community revitalization plans by rewarding projects "that demonstrate comprehensive strategies for neighborhood revitalization." *Ibid.* Such a plan is one endorsed by a municipality to designate areas in need of redevelopment. *Id.* at 3327. In addition, HMFA altered its past practice of giving more weight to 100% affordable projects; now, the agency gives equal preference for mixed-income housing developments. *Ibid.*

Further, HMFA observed that more funding for projects in suburban areas may have a negative impact on the allocation of tax credits to urban areas. 35 *N.J.R.* 3304. It also expressed doubt that constructing additional affordable housing in suburban areas would in fact create housing opportunities for the inner city, citing studies that had shown that "suburban affordable residential

units were often occupied by fully-eligible, low-income *suburban* residents." 35 *N.J.R.* 3305. Agreeing with appellants that concentrated poverty negatively impacts inner city residents, the agency nevertheless stated that the appropriate way to attack the problem was not necessarily to shift tax credits for urban to suburban locations. 35 *N.J.R.* 3311. It was its view that its responsibility was to engage and invest in the more troubled neighborhoods and communities in the State. It explained:

> Revitalization of our cities can address the racial segregation Fair Share decries. Urban revitalization programs, including programs that replace dilapidated low-income housing with mixed-income housing, should promote integration in the long run and make our cities vibrant communities for people of all races and economic means. Attractive and safe new housing, combined with the demolition of old, high-rise public housing and the incorporation of commercial uses, is the first step. Upgrade of housing stock in cities, combined with commercial endeavors, should spark eventual gentrification and the return to the cities of higher-economic people of all races. Surely a moratorium on financial assistance to urban centers does not address white flight or encourage persons of greater means to return to the cities. [35 *N.J.R.* 3312.]

## II

Appellants and amici argue that HMFA violates Title VIII by failing to administer its low-income housing tax-credit program in such a way as "affirmatively to further" the purposes of the act. 42 *U.S.C.A.* § 3608(e)(5) Specifically, they urge the invalidation of the 2003 QAP and a remand for the promulgation of rules that comply with federal law and HUD-site selection regulations in order to "promote integration by generally siting affordable housing in areas that are not already home primarily to people of color." Further, they contend that HMFA must develop a method of considering racial and other demographic information, and modify its "point system" in a manner that would foster racial integration and economic improvement for minorities.

### A. *Standard of Review*

Administrative regulations are presumed to be valid. *New Jersey State League of Municipalities v. Department of Cmty. Affairs,* 158 *N.J.* 211, 222, 729 *A.*2d 21 (1999). "This

presumption of validity attaches if the regulation is within the authority delegated to the agency and is not on its face beyond the agency's power." *Medical Soc'y of New Jersey v. New Jersey Dep't of Law and Pub. Safety,* 120 *N.J.* 18, 25, 575 *A.*2d 1348 (1990).

Courts generally disfavor finding "that an agency acted in an *ultra vires* fashion in adopting regulations. . . ." *New Jersey Coalition of Health Care Prof'ls, Inc. v. New Jersey Dep't of Banking and Ins.,* 323 *N.J.Super.* 207, 229, 732 *A.*2d 1063 (App. Div.), *certif. denied,* 162 *N.J.* 485, 744 *A.*2d 1208 (1999). The party challenging the rule has the burden of proving that it is arbitrary, capricious or unreasonable. *New Jersey State League of Municipalities, supra,* 158 *N.J.* at 222, 729 *A.*2d 21. To determine unreasonableness, a court examines whether: (1) the agency's decision offends the State or Federal Constitution; (2) the agency action violates express or implied legislative policies; (3) the record contains substantial evidence to support the findings on which the agency based its action; and (4) applying legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made based on the relevant factors. *George Harms Constr. Co., Inc. v. New Jersey Turnpike Auth.,* 137 *N.J.* 8, 27, 644 *A.*2d 76 (1994).

A court is not governed by an agency's interpretation of the statute that governs its actions or the agency's resolution of a purely legal issue. *In re New Jersey Individual Health Coverage Program,* 353 *N.J.Super.* 494, 523, 803 *A.*2d 639 (App.Div.), *certif. denied in part and granted in part,* 175 *N.J.* 170, 814 *A.*2d 635 (2002). A regulation "cannot alter the terms of a statute or frustrate the legislative policy." *Medical Soc'y of New Jersey, supra,* 120 *N.J.* at 25, 575 *A.*2d 1348. Ordinarily, a court places weight on the interpretation of legislation by the administrative agency which is charged with enforcing it. *Id.* at 26, 575 *A.*2d 1348. However, appellants correctly point out that federal courts do not defer to a state agency's interpretation of a federal statute. *Orthopaedic Hosp. v. Belshe,* 103 *F.*3d 1491, 1495–96 (9th Cir.

1997), *cert. denied,* 522 *U.S.* 1044, 118 *S.Ct.* 684, 139 *L.Ed.*2d 632 (1998); *see also Langlois v. Abington Hous. Auth.,* 234 *F.Supp.*2d 33, 77 (D.Mass.2002) (A court owes no deference to a local housing authority's interpretation of the "affirmatively to further" requirement because these local authorities "have no[t] demonstrated expertise in the pursuit of fair housing ...").

## B. *Title VIII*

Title VIII makes it unlawful "[t]o refuse to sell or rent ... or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 *U.S.C.A.* § 3604(a). The Secretary of Housing and Urban Development must "administer the programs and activities relating to housing and urban development *in a manner affirmatively to further the policies of this subchapter* [.]" 42 *U.S.C.A.* § 3608(e)(5) (emphasis added). In addition: "All executive departments and agencies shall administer their programs and activities relating to housing and urban development ... in a manner affirmatively to further the purposes of this subchapter and shall cooperate with the Secretary to further such purposes." 42 *U.S.C.A.* § 3608(d).

Shortly after the enactment of Title VIII, the Supreme Court in dictum identified one of its purposes as promoting integrated living patterns. *Trafficante v. Metropolitan Life Ins. Co.,* 409 *U.S.* 205, 211, 93 *S.Ct.* 364, 368, 34 *L.Ed.*2d 415, 420 (1972). A number of federal courts have relied on this language to conclude that one of the purposes of Title VIII is to foster racial integration. *See, e.g., Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 *F.*2d 926, 935 (2d Cir.), *aff'd,* 488 *U.S.* 15, 109 *S.Ct.* 276, 102 *L.Ed.*2d 180 (1988); *N.A.A.C.P. v. Secretary of Hous. and Urban Dev.,* 817 *F.*2d 149, 155 (1st Cir.1987) (and cases cited therein); *Otero v. New York City Hous. Auth.,* 484 *F.*2d 1122, 1134 (2d Cir.1973); *see also Shannon v. United States Dep't of Hous. & Urban Dev.,* 436 *F.*2d 809, 820 (3d Cir.1970) (pre-*Trafficante* case reaching the same result).

In *Shannon, supra,* plaintiffs, residents and organizations in a racially mixed neighborhood, challenged HUD's decision to finance a low-income housing project. 436 *F.*2d at 811. Plaintiffs alleged that the project would increase the already high concentration of low-income black residents in the neighborhood, thereby adversely affecting property values and the quality of life in the neighborhood. *Id.* at 818. The court held that one goal of Title VIII was to prevent the increase of racial concentration which was likely to lead to urban blight. *Id.* at 820–21. Therefore, HUD was required to make a careful analysis of the impact of the proposed development on the existing neighborhood before committing to funding. *Ibid.*

The *Shannon* court ordered a remand and suggested several criteria to inform HUD in making its determination, including consideration of: (1) where low-income housing is now located in the relevant geographical area; (2) any similar existing projects occupied primarily of tenants of one race; (3) what is the racial balance of the schools to be attended by the project children; and (4) the availability of alternative sites. *Id.* at 821–22. The court cautioned, however:

> *Nor are we suggesting that desegregation of housing is the only goal of national housing policy. There will be instances where a pressing case may be made for the rebuilding of a racial ghetto.* We hold only that the agency's judgment must be an informed one; one which weighs the alternatives and finds that the need for physical rehabilitation or additional minority housing at the site in question clearly outweighs the disadvantage of increasing or perpetuating racial concentration.
>
> [*Id.* at 822 (emphasis added).]

*See also Otero, supra,* 484 *F.*2d at 1134 (in enacting Title VIII, it was the intention of Congress to "stem the spread of urban ghettos and to promote open, integrated housing ...");
*N.A.A.C.P., supra,* 817 *F.*2d at 155 (rejecting HUD's position that Title VIII required nothing more than to refrain from discriminating itself or purposely aiding others in discrimination, holding that Congress desired that HUD "use its grant programs to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases").

## C. Is the HMFA bound by the "affirmatively to further" requirement under Title VIII?

■ A state agency implementing a federal program must comply with applicable federal law, federal regulations, and federal policies. *In re Adoption of Amendments to N.J.A.C. 6:28–2.10, 3.6 and 4.3*, 305 *N.J.Super.* 389, 402, 702 *A.*2d 838 (App.Div.1997). HMFA is a "public housing agency," which is defined by federal law as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage or assist in the development or operation of low-income housing." 42 *U.S.C.A.* § 1437a(b)(6). Most federal cases addressing the "affirmatively to further" issue hold or suggest that local housing agencies are bound by the Title VIII requirement. *See Wallace v. Chicago Hous. Auth.*, 298 *F.Supp.*2d 710, 719 (N.D.Ill.2003); *Langlois, supra*, 234 *F.Supp.*2d at 73. *See Reese v. Miami–Dade Cty.*, 210 *F.Supp.*2d 1324, 1329 (S.D.Fla.2002) (the " 'affirmatively' further fair housing" requirement "imposes a binding obligation upon the States"), *aff'd*, 77 *Fed.Appx.* 506, 2003 *WL* 21804309 (11th Cir.Fla.2003).

The Executive Branch of the federal government as well has expressed the view that local housing authorities are subject to the "affirmatively to further" duty. Relying on Title VIII, President Clinton declared that HUD had the primary authority and responsibility for administering affordable housing and affirmatively to further fair housing. *Executive Order No. 12892*, 59 *Fed.Reg.* 2939, § 2–201 (Jan. 17, 1994). He declared that the head of "each executive agency" was responsible for ensuring that its programs and activities relating to housing were "administered in a manner affirmatively to further the goal of fair housing" as required by Title VIII. *Id.* at § 2–202. To that end, Executive agency heads must take appropriate steps to ensure that all participants in federal housing programs complied with the Executive Order. *Id.* at § 2–203. That includes state or local entities. *Id.* at § 5–502.

If any executive agency concludes that any person or entity (*including any State or local public agency* ) applying for or participating in, or supervised or regulated under, a program or activity relating to housing and urban development has not

complied with this order or any applicable rule, regulation, or procedure issued or adopted pursuant to this order, it shall endeavor to end and remedy such violation by informal means, including conference, conciliation, and persuasion.

[*Ibid.* (emphasis added).]

If informal means are unsuccessful, the agency "shall impose such sanctions as may be authorized by law." *Ibid.*

 Finally, HMFA and its parent authority, the Department of Community Affairs (DCA), have recognized the legality and even desirability of affirmatively furthering fair housing by adopting programs to reduce racial and economic segregation. Appellants pointed out in their comments to the 2003 QAP that the DCA had adopted a five-year plan (Consolidated Plan) [4] which favored housing programs to reduce racial and economic segregation. This plan is required by HUD in order for the State to participate in federal community planning and development programs. 24 *C.F.R.* § 91.315. DCA's five-year plan submitted to HUD identified several principles for implementing the plan, including the reduction and elimination of "racial and economic segregation/low income concentration and, wherever possible incorporate measures that will undo the negative effects of past practices." Consolidated Plan at 48. We are therefore satisfied that HMFA is subject to the "affirmatively to further" requirement under Title VIII.

### D. *How must the HMFA satisfy the "affirmatively to further" duty?*

Appellants contend that Title VIII requires state housing credit agencies to "promote racial integration." Specifically, appellants argued before us that, in order to satisfy that duty, HMFA should adopt in a wholesale manner the HUD site-selection procedure set forth in 24 *C.F.R.* § 941.202. The regulation states that proposed sites for newly-constructed or rehabilitated public-housing projects must be approved by a HUD "field office" as meeting the following standards:

---

[4] www.state.nj.us./dca/dhcr2000–2004conplan.pdf

(c)(1) The site for new construction projects must not be located in:

(i) *An area of minority concentration* unless (A) sufficient, comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration, or (B) the project is necessary to meet overriding housing needs which cannot otherwise feasibly be met in the housing market area. An "overriding need" may not serve as the basis for determining that a site is acceptable if the only reason the need cannot otherwise feasibly be met is that discrimination on the basis of race, color, religion, creed, sex, or national origin renders sites outside areas of minority concentration unavailable; or

(ii) A racially mixed area if the project will cause a significant increase in the proportion of minority to non-minority residents in the area.

. . . .

(d) *The site must promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons.*

[24 *C.F.R.* § 941.202 (emphasis added).]

However, neither HUD nor the I.R.S. has expressly mandated that state agencies incorporate 24 *C.F.R.* § 941–202 into the LIHTC program. The absence of such a directive suggests strongly that HUD recognized that the site-selection criteria under the regulation may be incompatible with the specific selection criteria and preferences mandated by the federal tax-credit statute. 26 *U.S.C.A.* § 42(m)(1)(B) and (C). Moreover, as HMFA convincingly points out, it is a funding agency, rather than a siting agency. It does not select the sites where affordable housing projects receiving tax credits will be constructed. In addition, it possesses no statutory power to "steer projects from one neighborhood or one municipality to another based on the racial composition of the neighborhood or municipality."

Appellants and amici also rely on a section of the I.R.S. regulations, which states:

If a residential rental unit in a building is not for use by the general public, the unit is not eligible for a section 42 credit. A residential unit is for use by the general public if the unit is rented in a manner consistent with housing policy governing non-discrimination, as evidenced by rules or regulations of the Department of Housing and Urban Development (HUD) (24 CFR subtitle A and chapters I through XX). See HUD Handbook 4350.3 (or its successor).

[26 *C.F.R.* § 1.42–9(a).]

We agree with HMFA that by its terms this regulation applies only to the rental of units within a project financed by the tax-credit program. It does not expressly apply to the criteria utilized by a housing credit agency to allocate those tax credits.

In our view, HMFA's "affirmatively to further" duty must be defined congruent with its statutory powers.

HMFA was created by the New Jersey Housing and Mortgage Finance Agency Law of 1983, *L.* 1983, c. 530, § 4 (*N.J.S.A.* 55:14K–4a). In enacting the law, the Legislature found that changing market conditions had reduced the availability of financing and construction of private-sector housing in the State, resulting in an adverse effect on the availability of affordable housing. *N.J.S.A.* 55:14K–2a and b. The Legislature therefore declared that it was in the best interest of the State for, among other steps, HMFA to: (1) assure the availability of financing for the rental, construction and rehabilitation of new and existing residential structures; (2) "[s]timulate the construction, rehabilitation and improvement of adequate and affordable housing ... so as to increase the number of opportunities for adequate and affordable housing ..., including particularly New Jersey residents of low and moderate income"; and (3) "[a]ssist in the revitalization of the State's urban areas...." *N.J.S.A.* 55:14K–2e.

To that end, the agency was empowered to adopt regulations "as shall be necessary or desirable to carry out the purposes of this act." *N.J.S.A.* 55:14K–5g. It was given the power to provide to housing sponsors, through eligible loans "or otherwise," financial assistance for housing projects, provided that the sponsors meet all the requirements of the act. *N.J.S.A.* 55:14K–5y. The agency may also "administer and to enter into agreements to administer programs of the federal government or any other entity which are in furtherance of the purposes of the act...." *N.J.S.A.* 55:14K–5dd.

What is clear from this legislative scheme is that HMFA's overriding mission is to foster, through its financing and other powers, the construction and rehabilitation of housing, particularly

affordable housing, in order to address needs caused by various social factors, including changes in market conditions. The promotion of racial integration may be a desirable by-product of HMFA's exercise of these duties. Indeed, we have no doubt that, in order to advance the goals of Title VIII, the agency should foster racial integration in the manner by which it administers its programs. However, HMFA's central mission and statutory purposes should not be ignored or compromised in achieving that goal.

Specifically, HMFA's power to allocate low-income housing tax credits is circumscribed by 26 *U.S.C.A.* § 42(m)(1)(B) and (C). Under that statute, the agency is required to adopt a QAP that establishes specific selection criteria and preference standards that will guide it in the allocation of tax credits to competing housing sponsors, local agencies and private developers. *Ibid.* The agency must consider such selection criteria as project location, housing needs, project and sponsor characteristics, tenant populations and public housing waiting lists. 26 *U.S.C.A.* § 42(m)(1)(C). "Preference" in allocating credits must be given to projects serving the lowest-income tenants and projects located in "qualified census tract[s]," that is, areas "in which 50 percent or more of the households have an income which is less than 60 percent of the area median gross income," or in which there exists a poverty rate of 25 percent or greater. 26 *U.S.C.A.* § 42(m)(1)(B); *see* 25 *U.S.C.A.* § 42(d)(5)(C)(ii)(I). To comply with these explicit standards, the agency's QAP must focus primarily on the economic status of the tenants, housing needs, and sponsor qualifications, not racial composition of the area or proposed project.

In sum, HMFA's "affirmatively to further" duty must be measured by consideration of its far-reaching housing agenda; to end homelessness by addressing the needs of low- and moderate-income families through the fostering of new construction and rehabilitation of affordable-housing units. Title VIII may require the agency to administer its tax credit program so as to achieve a

condition in which individuals of all races have equal housing-market choices. *See* 24 *C.F.R.* 200.610 (May 8, 1975). But achievement of that goal, by focusing primarily on the racial composition of a relevant housing locale, may compromise HMFA's fundamental mission. Considering these duties and goals, we hold that, in adopting the 2003 QAP, the agency has administered a federal low-income tax credit program in an manner "affirmatively to further" the goals of Title VIII.

Clearly, the QAP provides incentives to invest in minority neighborhoods and to "improv[e] the quality and affordability of housing there to represent a real choice for assisted households." Department of Housing and Urban Development, *Notice of Funding Availability for Revitalization of Severely Distressed Public Housing; HOPE VI Revitalization and Demolition Grants, Fiscal Year 2003,* 68 *Fed.Reg.* 60178, 60199 (Oct. 21, 2003). The 2003 tax credit regulations provide an incentive for mixed-income housing developments, including the set-aside of credits for HOPE VI projects, thereby fostering replacement of existing high-rise public housing with less-dense single family, more economically integrated units. *See N.J.A.C.* 5:80–33.4(a)1 and (a)2.

At the same time, the 2003 QAP expands the potential for assisted housing opportunities in non-minority neighborhoods. HMFA argues that, and we agree, the providing of such mixed-income units will logically foster integration. HMFA recognized the need for the revision by acknowledging "a growing chasm forming between suburbs and cities" and by sending a "clear signal this year that affordable housing is to be viewed regionally." 35 *N.J.R.* 3326. To that end, the provision of tax-credit preferences to mixed-income communities advances the goal that "[p]eople should have the choice to settle in healthy, sustainable communities in any location. . . ." *Ibid.* (quoting *Millennial Housing Commission to Congress* (May 2002)).

Moreover, for the first time, the 2003 QAP gives preference to projects located within the "smart growth areas." 35 *N.J.R.*

3303.[5] The 2003 QAP provides an incentive for municipalities to satisfy their *Mount Laurel* obligation by giving preference points for low-income projects made part of a court-ordered, or COAH compliance plan. *N.J.A.C.* 5:80–33.15(a)7. Projects that are located within a smart growth area that are *not* located in a qualified census tract (low-income or poverty level areas) shall be awarded ten points, the highest preference allowed by the regulations. *N.J.A.C.* 5:80–33.15(a)7(i). In our view, these measures affirmatively further the goals of Title VIII.

Appellants and amici argue that these steps are inadequate because HMFA's predominant focus is still on the allocation of tax credits to the urban areas. This focus, they assert, perpetuates the racial ghetto, subjects minority children to substandard education and deprives minorities from alternative housing choices in the suburban areas.

HMFA responds that it resists making race the predominant factor in designing QAPs, not because it opposes racial integration, but because it fears that such a race-based remedy would be invalidated on equal protection grounds. *See* 35 *N.J.R.* 3312–13 (July 21, 2003). For this proposition, HMFA relies on *Regents of Univ. of California v. Bakke,* 438 *U.S.* 265, 98 *S.Ct.* 2733, 57 *L.Ed.2d* 750 (1978), which set aside a race-based quota system for admission to a medical school. Since deciding *Bakke,* the Supreme Court has made it clear that any race-based classification imposed by government is subject to strict scrutiny, and is valid only when necessary to further a compelling governmental interest. Moreover, race-based classifications must be specifically and narrowly tailored to accomplish that compelling interest. *Grutter*

---

[5] "Smart growth areas" are defined as:

locations that will provide for much of the State's future development and redevelopment. Smart growth areas promote growth in compact forms and protect the character of existing stable communities. The areas defined as smart growth areas are Planning Area 1, Planning Area 2 (sewered), Designated Centers, Proposed Centers (sewered) and Identified Centers (sewered). [*N.J.A.C.* 5:80–33.2.]

*v. Bollinger,* 539 *U.S.* 306, 123 *S.Ct.* 2325, 156 *L.Ed.*2d 304 (2003); *Adarand Constructors, Inc. v. Pena,* 515 *U.S.* 200, 115 *S.Ct.* 2097, 132 *L.Ed.*2d 158 (1995); *City of Richmond v. J.A. Croson Co.,* 488 *U.S.* 469, 109 *S.Ct.* 706, 102 *L.Ed.*2d 854 (1989).

In the housing context, federal courts have held that the "affirmatively to further" obligation of Title VIII will not save race-based quota systems from equal protection scrutiny even if they were designed to promote integration. *United States v. Starrett City Assocs.,* 840 *F.*2d 1096 (2d Cir.), *cert. denied,* 488 *U.S.* 946, 109 *S.Ct.* 376, 102 *L.Ed.*2d 365 (1988); *United States v. Charlottesville Redev. & Hous. Auth.,* 718 *F.Supp.* 461 (W.D.Va.1989). *See also South–Suburban Hous. Ctr. v. Greater South Suburban Board of Realtors,* 935 *F.*2d 868, 883 (7th Cir.1991) ("*Starrett City* and *Charlottesville* both mandate the conclusion that an interest in racial integration alone is insufficient to justify a racial quota system which favors whites and thereby lessens housing opportunities for minorities"), *cert. denied,* 502 *U.S.* 1074, 112 *S.Ct.* 971, 117 *L.Ed.*2d 136 (1992). However, an affirmative marketing plan which encourages whites to move into black neighborhoods, and blacks to move into white neighborhoods, does not violate the equal protection clause because such a plan "furthers the goal of integration while providing equal opportunities to all." *Ibid.*

A recent Fifth Circuit case demonstrates the fine line that must be drawn when the government seeks to promote integration. *Walker v. City of Mesquite,* 169 *F.*3d 973 (5th Cir.1999), *cert. denied,* 528 *U.S.* 1131, 120 *S.Ct.* 969, 145 *L.Ed.*2d 840 (2000). That case arose out of a consent decree which ordered the Dallas Housing Authority and HUD to site affordable housing in predominantly white areas of metropolitan Dallas. The consent decree was designed to remedy a long history of blatant racial discrimination which resulted in segregation. *Id.* at 976–77. Residents of predominantly white areas sought to enjoin the construction of two new public housing projects adjacent to their neighborhoods, arguing that the remedy was "not narrowly tailored because it

requires that the new units be constructed in predominantly white areas." *Id.* at 978.

The Fifth Circuit agreed and vacated the consent order, stating that "[e]xplicit racial classifications ... establish unequal treatment by their very nature." *Id.* at 981. "Any explicit racial classification, regardless of the burdens or benefits it imposes, is suspect and subject to strict scrutiny." *Ibid.* Moreover, the remedy was not sufficiently narrowly tailored to eliminate the effects of past discrimination. *Id.* at 982. The court believed that the Section 8 housing program, "a race-neutral remedial measure," had previously proven successful in moving black families into white areas, and that non-racial site-selection criteria for public housing could result in such housing being constructed in non-minority areas. *Id.* at 985. "Because there are promising, non-racially discriminatory ways to continue desegregating public housing in Dallas, the provision of the court's remedial order calling for the construction or acquisition of units of public housing in 'predominantly white' areas is unconstitutional." *Id.* at 987.

These cases do not support HMFA's assumption that *any* measures to promote racial integration would violate the equal protection clause. At the same time, they do lend substance to HMFA's concern that criteria that are primarily race-based, may be constitutionally vulnerable, and may run counter to its statutory duty to "[a]ssist in the revitalization of the State's urban areas...." *N.J.S.A.* 55:14K–2e(4). During the administrative process before adoption of the 2003 QAPs, the mayor of the City of Elizabeth criticized the elimination of the urban cycle and neighborhood set-aside because it would have a negative impact on certain neighborhoods in urban areas and on projects within qualified census tracts. 35 *N.J.R.* 3304, 3318. Other commentators criticized the 2003 QAP as disproportionately favoring suburban centers over urban areas. 35 *N.J.R.* 3304. Therefore, mayors of inner cities or developers in urban areas may argue that emphasis on race-based selection criteria violates the equal protection clause by discriminating against minorities, or at the very

least that such criteria would have a disparate impact on minorities in violation of Title VIII. Should such a claim be proven, HMFA could be held in violation of 42 *U.S.C.A.* §§ 1983, 1988. *See Walker v. City of Mesquite,* 313 *F.*3d 246 (5th Cir.2002), *cert. denied,* 538 *U.S.* 962, 123 *S.Ct.* 1763, 155 *L.Ed.*2d 513 (2003).

## III

Appellants argue that "HMFA's investment in the perpetration of segregation [through its 2003 QAP], even if unintentional, still contravenes Title VIII" because the QAP's disparate impact on racial minorities "is ... quite obvious."

Federal courts have formulated a variety of tests for establishing a discriminatory impact in a Title VIII case. John E. Theuman, Annotation, *Evidence Of Discriminatory Effect Alone As Sufficient To Prove, Or To Establish Prima Facie Case Of, Violation Of Fair Housing Act,* 100 *A.L.R. Fed.* 97 (1990). However, in *In re Township of Warren,* 132 *N.J.* 1, 22–25, 622 *A.*2d 1257 (1993), our Supreme Court commented favorably on what it viewed as the "dominant view of the prevailing standards of proof in Title VIII cases," *id.* at 22, 622 *A.*2d 1257, set forth in *Huntington Branch, N.A.A.C.P. v. Town of Huntington, supra,* 844 *F.*2d at 934–37, which in turn adopted much of the analysis in *Resident Advisory Board v. Rizzo, supra,* 564 *F.*2d at 146–49

A plaintiff in a Title VIII case makes a prima facie case by showing that the challenged practice predictably or actually results in racial discrimination, that is, it has a discriminatory effect. *Huntington Branch, supra,* 844 *F.*2d at 934. No intent need be shown. *Ibid.* A discriminatory effect can arise in two contexts: (1) "adverse impact on a particular minority group"; or (2) "harm to the community generally by the perpetuation of segregation." *Id.* at 937.

Once plaintiff makes a prima facie case of adverse impact, "the defendant must prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and

that no alternative would serve that interest with less discriminatory effect." *Id.* at 936. A highly relevant factor here is whether the plaintiff is seeking to compel a government defendant to build housing or only to require that the defendant remove some obstacle to the construction of housing that some other party itself will build. *Ibid.* If a unit of government is blocking the construction of housing, then it would have a greater burden to justify its decision. *Ibid.*

In *In re Township of Warren,* 247 *N.J.Super.* 146, 588 *A.*2d 1227 (App.Div.1991), *certif. denied,* 127 *N.J.* 557, 606 *A.*2d 369 (1992), *rev'd in part,* 132 *N.J.* 1, 622 *A.*2d 1257 (1993), we rejected a challenge by the Public Advocate of the RCA provision of the Fair Housing Act, *N.J.S.A.* 52:27D–312a, which authorizes one municipality to transfer up to fifty percent of its fair share to another municipality. Applying the *Huntington Branch* analysis, we held that plaintiff had not made out a prima facie case of racial discrimination in violation of Title VIII, because the relevant section of the act:

> has no applicability to a decision by a suburban municipality to fund the construction or rehabilitation of housing in an urban municipality rather than to rezone for multifamily housing within its own boundaries. Nearly any government decision relating to land use or directing governmental funds to one municipality rather than another—whether for housing, education or other services—could have some impact on a racial composition of the affected municipalities.
>
> [247 *N.J.Super.* at 168–69, 588 *A.*2d 1227.]

But "some impact" is not enough to establish a prima facie case. *Id.* at 169, 588 *A.*2d 1227. We added that the RCA furthered a legitimate governmental interest and no alternative would serve that interest with less discriminatory impact, *ibid,* since the State had a legitimate and compelling interest in rehabilitating and replacing substandard housing in urban areas. We concluded:

> Therefore, even if an RCA were considered to have a 'discriminatory effect' despite the fact that it will result in new or rehabilitated housing for a substantial number of minority residents of an urban area, it still would not violate the federal Fair Housing Act, because it furthers a legitimate, bona fide governmental interest and no alternative means are available which serve that interest with less discriminatory effect.
>
> [*Id.* at 169–70, 588 *A.*2d 1227.]

The Court denied certification on this aspect of our holding. *In re Township of Warren,* 127 *N.J.* 557, 606 *A.*2d 369 (1992).

In the same case, the Public Advocate also challenged a COAH rule which allowed municipalities to set aside fifty percent of the eligible units to households that live or work in a municipality. The Supreme Court disagreed with our determination that this rule did not violate Title VIII, observing that on the sparse record before it, there was a significant possibility that an occupancy preference could cause a discriminatory impact on minorities. *In re Township of Warren, supra,* 132 *N.J.* at 38–39, 622 *A.*2d 1257. However, the Court invalidated the occupancy preference rule on state law grounds, holding that it did not comport with the Fair Housing Act (FHA), *N.J.S.A.* 52:27D–301 to –329, and the *Mount Laurel* doctrine. *Id.* at 29–36, 622 *A.*2d 1257.[6]

Applying the *Huntington Branch* test here, we conclude that appellants have not made out a prima facie case that the 2003 QAP has a substantial discriminatory effect, and, even if it does, the 2003 QAP furthers a legitimate governmental interest and no alternative would serve that interest with less discriminatory effect. The first question is whether the action has an adverse impact on a particular minority group. *Huntington Branch, supra,* 844 *F.*2d at 937. The 2003 QAP authorizes tax credits to *all* areas of the State. Since this appeal does not challenge the actual allocation of tax credits in 2003, it is not relevant that most of the family cycle tax credits have gone to projects in urban municipalities.

Moreover, it is more likely that HMFA funded fewer projects in suburban municipalities because of COAH's delay in promulgating the third round fair-share regulations, not because of the manner by which the 2003 QAP establishes selection criteria preferences. Affordable housing advocates have argued that COAH's delay in proposing third round fair share obligations and regulations, combined with COAH's practice of routinely extending second-round

---

[6] HMFA generally prohibits residency preferences. *N.J.A.C.* 5:80–22.13(a).

substantive certification, *see N.J.A.C.* 5:91–14.3, have effectively placed a "moratorium" on municipalities' *Mount Laurel* obligations. Mary P. Gallagher, *An Anti–COAH Coalition,* 169 *N.J.L.J.* 1028 (Sept. 9, 2002). It has been suggested that the delay and wholesale extensions have effectively put the *Mount Laurel* doctrine on hold. Editorial, *COAH: Turning Steel into Putty,* 171 *N.J.L.J.* 154 (Jan 20, 2003). The lack of applications from projects in suburban municipalities may be the result of this hiatus in the *Mount Laurel* doctrine, rather than disincentives in the 2003 QAP.

The next question is whether the 2003 QAP has a discriminatory impact because it harms "the community generally by the perpetuation of segregation." *Huntington Branch, supra,* 844 *F.*2d at 937. In this case, the relevant "community" is the entire State, and HMFA has a duty to implement the low-income housing tax credit program so as to create further opportunities to racial minorities to move to all areas of the State. However, the 2003 QAP does not represent a violation of that duty because, as earlier stated, it does provide housing opportunities in suburban areas.

Further, the record indicates that developer interest in tax credits is lower in suburban areas than it is in urban areas. In responding to criticism of the 2002 QAP, HMFA stated that it increased tax credits allocable to the Suburban Cycle in 2002, even though in 2001 there was little demand for credits for suburban projects. 34 *N.J.R.* 1579 (May 6, 2002). In response to comments on the 2003 QAP, HMFA stated that in an effort to encourage the construction of affordable units in suburban areas, it *increased* by over 31% the amount of credits provided in the Suburban Cycle from 1999 to 2002. 35 *N.J.R.* 3301 (July 21, 2003). It also observed that a suburban project had a much better chance of securing tax credits since funding had gone up but demand was still limited. 35 *N.J.R.* at 3302–03. The 2003 QAP cannot be deemed to have a discriminatory impact if, as HMFA claims, projects in suburban areas are more likely to receive tax credits

than are projects in urban areas. Indeed, as earlier noted, if HMFA were to fund most of the applicants for projects in suburban areas, and a significantly lower percentage of projects from urban areas, it could be in violation of Title VIII because its funding decisions could be construed as making housing unavailable on the basis of race, contrary to 42 *U.S.C.A.* § 3604(a).

Even assuming appellants have established a prima facie disparate impact case, the 2003 QAP serves a legitimate governmental interest and no alternatives would appear to have any less discriminatory effect. HMFA must direct a substantial percentage of the tax credit allocations to urban areas because the enabling legislation mandates a preference to projects serving the lowest income tenants and to projects located in qualified census tracts, 26 *U.S.C.A.* § 42(m)(1)(B), and because HMFA's enabling legislation declares it in the public interest to revitalize New Jersey's urban areas. *N.J.S.A.* 55:14K–2e(4). Moreover, points out HMFA, the HOPE VI projects are by their very nature located predominantly in urban municipalities with a high percentage of minority residents. Once the agency satisfies these mandatory preferences, there is not much left; the agency must serve special needs projects as well as family and senior projects in suburban areas. Since, for the past several years, there has been a greater demand for tax credits for projects in urban areas than in suburban areas, providing even more funding for suburban projects is not a realistic alternative. We conclude that the 2003 QAP does not have a discriminatory impact in violation of Title VIII.

## IV

Appellants contend that the 2003 QAP should be invalidated because it will lead to or perpetuate segregation in the public schools. They reason that HMFA fosters school segregation by funding affordable housing in urban areas, since the students likely to reside in those units are also likely to be minorities who would attend schools that are also predominantly composed of minority students. Thus, the 2003 QAP violates state constitution-

al guarantees relating to equal protection and a thorough and efficient education.

Appellants invoke two constitutional provisions. First, the state constitution provides, in pertinent part, that: "No person shall . . . be segregated . . . in the public schools, because of . . . race, color, ancestry or national origin." *N.J. Const.* art. I, ¶ 5. In addition, the "thorough and efficient clause" requires the Legislature to "provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all children in the State between the ages of five and eighteen years." *N.J. Const.* art. VIII, § 4, ¶ 1.

Under art. I, ¶ 5, the Commissioner of Education is required to take measures to prevent racial segregation in the public schools. *Jenkins v. Township of Morris Sch. Dist.,* 58 *N.J.* 483, 279 *A.*2d 619 (1971). Thus, in *Jenkins,* the Court held that the Commissioner of Education had the ability to enjoin a township in order to prevent racial segregation from withdrawing its students from a high school. *Id.* at 504–06, 279 *A.*2d 619; *see also Booker v. Board of Educ., Plainfield,* 45 *N.J.* 161, 173–81, 212 *A.*2d 1 (1965), However, the Court has declined to rule on whether the State Board of Education has the authority to require regionalization of school districts in order to promote racial integration. *Board of Educ., Borough of Englewood Cliffs v. Board of Educ. of City of Englewood,* 132 *N.J.* 327, 329, 625 *A.*2d 483, *cert. denied,* 510 *U.S.* 991, 114 *S.Ct.* 547, 126 *L.Ed.*2d 449 (1993). The Court has construed the thorough and efficient education clause as requiring the Legislature to provide funding to poorer urban school districts at the same level as property-rich districts. *Abbott v. Burke,* 119 *N.J.* 287, 295, 575 *A.*2d 359 (1990).

We do not believe that either of these constitutional provisions, as interpreted by the Court, imposes on HMFA the obligation to allocate more tax credits to housing developments in non-urban municipalities. In the first place, HMFA has no jurisdiction over public education; its statutory obligation is to administer the tax credit program in a manner consistent with the

selection criteria and preferences specified by 26 *U.S.C.A.* § 42(m), and those preferences mandate a substantial allocation to urban areas. Moreover, as earlier discussed, state policy, as indicated by the allowance of RCAs, and HMFA's own statutory mandate to assist urban areas, encourage a substantial level of funding to urban areas.

Finally, it was not arbitrary, capricious or unreasonable for HMFA to conclude that better housing in urban areas might facilitate the thorough and efficient education clause. Improved housing in urban areas could enable the children who reside in those housing units to develop a better focus on their scholastic endeavors. The Court has recognized that substandard housing is one of many socio-economic conditions that impairs educational achievement. *Id.* at 369, 375, 575 *A.2d* 359. It would be contradictory and self-defeating to direct financing away from urban areas when the Court has ordered a massive infusion of public tax money to improve public education in urban areas.

## V

Appellants argue that HMFA "may not ignore" the fact that the agency is bound by the *Mount Laurel* doctrine and its principles. They urge that we find that: (1) HMFA is required by the State Constitution to "link its plan, design, and allocation process with the *Mount Laurel* doctrine"; and (2) HMFA has "acted for years" in contravention of the *Mount Laurel* doctrine by interfering "unreasonably with the production of affordable housing in areas of high opportunity that are not ghettoes." Citing Justice Stein's dissent in *Toll Bros. Inc. v. Township of West Windsor*, 173 *N.J.* 502, 569, 575, 803 *A.2d* 53 (2002) (Stein, J., concurring in part and dissenting in part), appellants also argue that HMFA's "inexplicable" refusal to provide funding for exclusionary zoning and to give tax credits where a developer receives density bonuses in an inclusionary zoning project results in virtually no housing for very low-income families.

HMFA responds that it, as earlier noted, has attempted to facilitate the *Mount Laurel* doctrine by including significant incentives in the 2003 QAP that are designed to assist suburban communities in fulfilling their affordable housing obligations. Also, in response to appellants' comments to the proposed 2003 QAP, HMFA noted that FHA encourages affordable housing in urban areas through RCAs, but that nonetheless HMFA seeks to encourage the construction of affordable housing in suburban areas by devising regulations which made it more likely that an applicant for a suburban development would receive approval. 35 *N.J.R.* 3316. Moreover, it notes that the 2003 QAP permits some developments receiving a density bonus to also qualify for what the agency described as "4% tax credits." *Ibid.* However, it contends that it was beyond its statutory authority in administering the LIHTC program to compel municipalities or developers to apply for tax credits. 35 *N.J.R.* 3312.

■ The *Mount Laurel* doctrine requires municipalities to adopt land use ordinances that create a realistic opportunity for the construction of affordable housing. *Mount Laurel I, supra,* 67 *N.J.* at 174, 336 *A.*2d 713. As defined in *Mount Laurel II,* 92 *N.J.* at 208–09, 456 *A.*2d 390:

> The constitutional basis for the *Mount Laurel* doctrine remains the same. The constitutional power to zone, delegated to the municipalities subject to legislation, is but one portion of the police power and, as such, must be exercised for the general welfare. When the exercise of that power by a municipality affects something as fundamental as housing, the general welfare includes more than the welfare of that municipality and its citizens: it also includes the general welfare—in this case the housing needs—of those residing outside of the municipality but within the region that contributes to the housing demand within the municipality. Municipal land use regulations that conflict with the general welfare thus defined abuse the police power and are unconstitutional. In particular, those regulations that do not provide the requisite opportunity for a fair share of the region's need for low and moderate income housing conflict with the general welfare and violate the state constitutional requirements of substantive due process and equal protection. *Mount Laurel I,* 67 *N.J.* at 174 and 181, 336 *A.*2d 713.

The Legislature responded to *Mount Laurel II* with the enactment of the FHA, which in essence codified the *Mount Laurel* doctrine. *Toll Bros., Inc. v. Township of Windsor, supra,* 173

*N.J.* at 513, 803 *A.*2d 53; *Holmdel Builders Ass'n v. Township of Holmdel,* 121 *N.J.* 550, 556, 583 *A.*2d 277 (1990). The FHA imposes obligations on the HMFA. *N.J.S.A.* 52:27D–321. The agency "shall establish affordable housing programs to assist municipalities in meeting the obligation of developing communities to provide low and moderate income housing." *Ibid.* Among many other things, HMFA "shall to the extent of available funds, award assistance to affordable housing programs located in municipalities whose housing elements have received substantive certification from the council, or which have been subject to a builder's remedy or which are in furtherance of a regional contribution agreement approved by the council." *N.J.S.A.* 52:27D–321b.

HMFA has never disputed that its policies, including its administration of the tax credit program, should be consistent with the *Mount Laurel* doctrine, and should assist municipalities to fulfill their *Mount Laurel* obligation. As we have noted, in its 2003 QAP, HMFA took steps to fulfill that statutory obligation by awarding extra points for mixed-income housing, and to affordable-housing programs financed by tax credits which assist municipalities in meeting their fair-share housing obligation. *N.J.A.C.* 5:80–33.15(a)7.

Appellants' attack on the density bonus provisions of the 2003 QAP presents a more difficult problem. The relevant provisions state:

> (b) If a municipality has created a density bonus subsidy to assist the low- or moderate-income units in a project, the project may not receive volume cap credits unless the subsidy is insufficient to assure the financial feasibility of the project. This subsection shall not be evaded by failing to apply all or any portion of the subsidy to the low- or moderate-income units, by diverting all or any portion of the subsidy to other uses or by using any other device in which all or any portion of the subsidy is not used to benefit low- or moderate-income housing.
>
> [*N.J.A.C.* 5:80–33.9(b).]

> (a) If a municipality has created a density bonus subsidy to assist the low- or moderate-income units in a project, the project may not compete for tax credits (ceiling tax credits). This subsection shall not be evaded by failing to apply all or any portion of the subsidy to the low- or moderate-income units....
>
> [*N.J.A.C.* 5:80–33.12(a).]

Tax credits are a limited resource to develop affordable housing, and in the past the majority of applications have been denied. *In re Tax Credit of Pennrose Props., supra,* 346 *N.J.Super.* at 485, 788 *A.*2d 787. "Presumably, at least in part because of the limited resources available, regulations adopted by the HMFA provide that tax credits are not available to a developer who has already received another form of incentive for subsidized housing—a density bonus subsidy." *Id.* at 486, 788 *A.*2d 787. In other words, the tax credit program is a zero sum game; any award to a project which also receives a density bonus necessarily results in another project being denied funding.

Appellants may be right that, as a practical matter, some suburban projects require both a density bonus and a tax credit to provide housing to the very poor. As noted by the dissenting opinion in *Toll Bros., supra,* 173 *N.J.* at 569–75, 803 *A.*2d 53, COAH regulations do not require inclusionary developments to provide housing that is affordable to individuals or families who earn less than forty percent of the region's median income. The dissent described as "inexplicable" HMFA regulations which disallow tax credits to inclusionary developments which have benefited from a density bonus. *Id.* at 575, 803 *A.*2d 53. The majority neither agreed nor disagreed with the proposition that the *Mount Laurel* doctrine was not meeting the needs of the very poor. It merely held that that issue was not ripe for review. *Id.* at 564–65, 803 *A.*2d 53.

HMFA responded to the density bonus/tax credit issue as follows:

> Fair Share states that the QAP "prohibit[s] developers who receive a density bonus from receiving tax credits" and that this contravenes the *Mount Laurel* doctrine. The HMFA disagrees with this comment. The QAP defines a "density bonus subsidy" as an economic benefit for low and moderate-income housing resulting from a zoning change that increases permitted density. The density bonus is an economic incentive that towns can bestow on developers which allows developers to produce more units on the same piece of land. Traditionally, the bonus is given to the developer in return for the developer using the economic benefit generated by the bonus to internally subsidize some of the housing units being built to be affordable to low and moderate-income families. This convention was created as an economic incentive for the private market to produce affordable

housing without imposing an additional strain on limited State and Federal resources.

Fair Share states that the QAP precludes tax credits for development receiving such a density bonus. To the contrary, projects with increased density that are affordable to 100 percent of the residents (and therefore do not receive an economic benefit based on the zoning change) are eligible to apply for nine-percent credits. Furthermore, N.J.A.C. 5:80–33.9(b) allows "density bonus" projects financed with tax-exempt bonds to receive volume cap tax credits (four-percent credits) pursuant to 26 U.S.C. § 42(h)(4) provided the subsidy generated by the density bonus is insufficient to assure the financial feasibility of the project.

. . . .

The QAP does prohibit a mixed-income project which has received a density bonus subsidy from receiving competitive ceiling credits (nine-percent credits). This limitation exists to prevent developers from abdicating their responsibility to internally subsidize the affordable units with proceeds from the market-rate units. Developers of these projects are still eligible for the four-percent credits and tax exempt financing.

[35 *N.J.R.* 3316 (footnotes omitted).]

We question whether this appeal is the appropriate vehicle for addressing what HMFA must do in the context of the *Mount Laurel* doctrine to meet the housing needs of the very poor, or whether its current policies which limit the amount of tax credits that may be awarded to a project which has also received a density bonus subsidy are valid. As HMFA pointed out in its response to comments (33 *N.J.R.* 3316), COAH has the primary responsibility for implementing the *Mount Laurel* doctrine. *Holmdel Bldrs., supra,* 121 *N.J.* at 577, 583 *A.*2d 277. COAH has proposed its third-cycle rules (35 *N.J.R.* 4636 (Oct. 6, 2003)), which appellants have criticized during rule-making proceedings as failing to meet the needs of the very poor. Those proposed regulations may be amended; if not, they are virtually certain to be challenged on appeal. HMFA's role under the FHA is to complement COAH's implementation of the *Mount Laurel* doctrine, not to be a major player in carrying out COAH's statutory mandate. We hold that HMFA's tax-credit regulations, including the restrictions against density bonus developments receiving tax credits, are valid under current law, since they are not inconsistent with the FHA or COAH regulations.

Finally, appellants contend that HMFA should take additional actions, such as condemning land in suburban areas, in order to facilitate the construction of LIHTC projects outside of urban areas. Appellants rely on *In re Egg Harbor Assocs.*, 94 *N.J.* 358, 367, 464 *A.*2d 1115 (1983), where the Court held that the DEP could condition the issuance of a CAFRA permit upon the developer's construction of some affordable housing. We do not believe *Egg Harbor Assocs.* helps appellant at all. The *Mount Laurel* doctrine imposes fair-share obligations on municipalities, which may employ a variety of techniques to fulfill that fair share. *N.J.S.A.* 52:27D–311a. If a municipality has satisfied its fair share obligation through, for example, zoning for inclusionary development and RCAs, then it has satisfied the *Mount Laurel* doctrine and HMFA would have no legal basis on which to condemn land.

We conclude that the 2003 QAP does not violate the *Mount Laurel* doctrine, as it is presently construed.

## VI

Appellants contend that HMFA's practice of allocating funding on the basis of housing need demonstrates an intention to discriminate against minorities in violation of the state and federal constitutions, Title VIII, and New Jersey's LAD. They add that HMFA's funding policies violate the LAD because they have a disparate impact on minorities.

There is no support for appellants' claim that HMFA's policy to allocate tax credits to areas of greatest need, irrespective of the probable racial makeup of the project being funded or the impact on the racial composition of the neighborhood, demonstrates an intention to discriminate. It has long been held that proof of a racially discriminatory intent or purpose is required to show a violation of the equal protection clause. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 *U.S.* 188, 194, 123 *S.Ct.* 1389, 1394, 155 *L.Ed.*2d 349, 358 (2003). Accord *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 *U.S.* 252, 264–65, 97 *S.Ct.* 555, 563, 50 *L.Ed.*2d 450, 464 (1977). A series of

governmental decisions "unexplainable on grounds other than race" may show an intent, when taken for "invidious purposes." *Id.* at 266–67, 97 *S.Ct.* at 564, 50 *L.Ed.*2d at 465 n. 14.

Here, as in *Cuyahoga Falls, supra*, 538 *U.S.* at 195, 123 *S.Ct.* at 1394, 155 *L.Ed.*2d at 359, appellants "point to no evidence suggesting that these official acts were themselves motivated by racial animus." [7] The 2003 QAP indicates an intent not to discriminate because it allocates tax credits based on racially neutral factors.

The LAD declares that "[a]ll persons shall have the opportunity to obtain . . . publicly assisted housing accommodation . . . without discrimination because of race. . . ." *N.J.S.A.* 10:5–4. "This opportunity is recognized as and declared to be a civil right." *Ibid.* The LAD prohibits any person, including a real estate broker or salesperson, from discriminating against any person based on race with respect to the sale or rental of real property. *N.J.S.A.* 10:5–12h(2). Banks and other financial institutions may not discriminate on the basis of race in the extension of credit, including a mortgage. *N.J.S.A.* 10:5–12i.

The only case cited in support of appellants' LAD claim is *In re Township of Warren, supra*, 132 *N.J.* at 25, 622 *A.*2d 1257, where the Court said: "Although our disposition of these appeals does not require that we decide the issue, our precedents persuasively suggests that proof of discriminatory impact alone, without proof of discriminatory intent, would be sufficient to establish a prima facie violation of the LAD." However, the Court did not suggest that the disparate impact analysis under the LAD would be any different from a disparate impact analysis under case law construing Title VIII. Indeed, appellants rely on Title VIII case law, which we have already discussed. There is no reason to believe

---

[7] In *Cuyahoga Falls, supra*, the official act consisted of placing a referendum on the ballot to revoke a site plan approval to construct an affordable housing project financed by tax credits. 538 *U.S.* at 188, 123 *S.Ct.* at 1389, 155 *L.Ed.*2d at 349.

that the disparate impact analysis would be any different under the LAD.

## VII

Appellants contend that HMFA erred in denying their request for a plenary hearing before the Office of Administrative Law. Appellants argue that a number of facts are in dispute, such as the validity of the data and studies submitted both by appellants and cited by HMFA. HMFA responds that contested case hearings before the Office of Administrative Law are not appropriate in rule-making proceedings.

Prior to adopting or amending any rule, an administrative agency must give notice of its intended action, *N.J.S.A.* 52:14B–4(a)(1), and afford interested parties a "reasonable opportunity to submit data, views, or arguments, orally or in writing." *N.J.S.A.* 52:14B–4(a)(3). In addition, "t[h]e agency shall consider fully all written and oral submissions respecting the proposed rule[,]" *ibid.,* and "[p]repare for public distribution a report listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views, and arguments contained in the submissions." *N.J.S.A.* 52:14B–4(a)(4). A rule is not valid "unless adopted in substantial compliance" with these provisions. *N.J.S.A.* 52:14B–4(d).

The purpose of these procedures is to give those affected by the proposed rule an opportunity to participate in the process, both to ensure fairness and also to inform regulators of consequences which they may not have anticipated. *In re Commissioner's Failure to Adopt 861 CPT Codes,* 358 *N.J.Super.* 135, 142–43, 817 *A.*2d 355 (App.Div.2003); *In re Adoption of Regulations Governing Volatile Organic Substances,* 239 *N.J.Super.* 407, 411, 571 *A.*2d 971 (App.Div.1990).

HMFA held that appellants were not entitled to a hearing before the OAL because (1) no contested case hearing is required

in rule-making proceedings; (2) a hearing would not result in an adjudication of individual rights or benefits; and (3) such a hearing would not involve specific parties. We agree. Administrative agencies have broad discretion in selecting the appropriate method to fulfill their statutory responsibilities. *Northwest Covenant Med. Ctr. v. Fishman,* 167 *N.J.* 123, 137, 770 *A.*2d 233 (2001); *In re Request for Solid Waste Util. Customer Lists,* 106 *N.J.* 508, 519, 524 *A.*2d 386 (1987). It may act either through rule-making, adjudication or informally. *Northwest Covenant Med. Ctr., supra,* 167 *N.J.* at 137, 770 *A.*2d 233. In this case there is no question that HMFA followed the rule-making procedure. Moreover, the 2003 QAP has all of the earmarks of a regulation in that it has wide coverage encompassing the general public, rather than an individual or a narrow select group, it is intended to be applied generally, uniformly and prospectively, it establishes legal standards or directives and reflects administrative policy. *Id.* at 135–36, 770 *A.*2d 233; *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 331–32, 478 *A.*2d 742 (1984).

On the other hand, quasi-judicial agency action is characterized by fact finding which involves persons or companies whose rights would be directly affected by the decision. *Northwest Covenant Med. Ctr., supra,* 167 *N.J.* at 136, 770 *A.*2d 233. A "[c]ontested case [is] a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing...." *N.J.S.A.* 52:14B–2(b).

Appellants argue that *In re Bell Atlantic–New Jersey, Inc.,* 342 *N.J.Super.* 439, 776 *A.*2d 926 (App.Div.2001), supports their claim that they were entitled to a hearing before an ALJ. There the court held that "[i]f an agency is exercising its administrative expertise to make a policy determination not involving the adjudication of disputed facts, a trial-type hearing is ordinarily not

required." *Id.* at 445, 776 *A.*2d 926. On the other hand, if the dispute hinges upon a factual-type determination, then a hearing is required. *Ibid.*

This appeal presents questions of law. Appellants have asked us to define HMFA's legal responsibilities under Title VIII, the Thorough and Efficient Education Clause, and the *Mount Laurel* doctrine. Once the court clarifies the law, appellants will be in a position to petition HMFA to promulgate or amend a future QAP. *Murnick v. New Jersey Hous. and Mortgage Fin. Agency,* 309 *N.J.Super.* 292, 298–99, 706 *A.*2d 1187 (App.Div.1998). Such a procedure would also enable the agency to consider the views of those who might favor greater funding for projects in urban municipalities, such as the mayors of those municipalities. *Ibid.* It makes little sense to remand for a plenary hearing on a QAP that has now expired.

Affirmed.